152 F.3d 88
 UNITED STATES of America, Appellee,
v.
Mohammed A. SALAMEH, Nidal Ayyad, Mahmoud Abouhalima, also
known as Mahmoud Abu Halima, Ahmad Mohammad Ajaj,
also known as Khurram Khan, Defendants-Appellants,
Ramzi Ahmed Yousef, Bilal Alkaisi, also known as Bilal
Elqisi, Abdul Rahman Yasin, also known as Aboud, Defendants.
 Nos. 94-1312 to 94-1315.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 18 and 19, 1997.
Decided Aug. 4, 1998.
 
 J. Gilmore Childers, Assistant United States Attorney for the Southern District of New York, New York City (Mary Jo White, United States Attorney, Lev L. Dassin, Michael J. Garcia, Dietrich L. Snell, Alexandra Rebay, Assistant United States Attorneys, of counsel), for appellee.
 Frank Handelman, New York City, for defendant-appellant Mohammed A. Salameh.
 Jeremy Schneider, Rothman, Schneider, Soloway & Stern, New York City, for defendant-appellant Nidal Ayyad.
 Miranda Fritz, Fritz & Miller, New York City, for defendant-appellant Ahmad Mohammad Ajaj.
 Lawrence Mark Stern, New York City, for defendant-appellant Mahmoud Abouhalima.
 Before: MESKILL, McLAUGHLIN and CALABRESI, Circuit Judges.
 PER CURIAM:
 
 
 1
 Following a lengthy jury trial in the United States District Court for the Southern District of New York (Duffy, J.), defendants were convicted of various crimes related to the bombing of the World Trade Center Complex in New York City. Defendants now appeal, asserting a congeries of arguments. For the reasons that follow, we affirm the judgment of the district court but remand for re-sentencing and decline to exercise jurisdiction over certain post-trial motions pending before the district court.
 
 
 2
 TABLE OF CONTENTS
Background ............................................................... 107
 I. Suppression Motions ............................................. 108
 A. Motions to Suppress Materials Seized From Ajaj ............ 108
 (1) Ajaj's Motion ........................................ 108
 (2) Abouhalima's Motion .................................. 110
 (a) Rule 403 ........................................ 110
 (b) First Amendment ................................. 111
 (3) Ayyad's Motion ....................................... 112
 B. Motion to Suppress Contents of the Storage Shed ........... 112
 (1) Probablese ........................................... 112
 (2) Franks Hearing ....................................... 113
 (3) Good Faith Reliance .................................. 114
 II. Procedural Motions .............................................. 114
 A. Abouhalima--Severance ..................................... 114
 (1) Ajaj's Holy War Materials ............................ 115
 (2) Salameh's Summation .................................. 116
 B. Abouhalima--Involuntariness of Statement .................. 117
 C. Ayyad--Failure to Grant Funds for Experts ................. 118
 D. Ajaj--Eastern District Plea Agreement ..................... 118
 III. Jury Selection .................................................. 120
 IV. Evidentiary Rulings ............................................. 122
 A. Admission of Evidence Regarding Bombing Victims ........... 122
 (1) Probative Value ...................................... 122
 (2) Danger of Unfair Prejudice ........................... 123
 B. Admission of Evidence Regarding Nosair .................... 123
 (1) Photographs of Salameh and Nosair .................... 123
 (2) Admission of Abouhalima's Contacts with Nosair ....... 124
 C. Admission of Identification ............................... 124
 (1) Use of Photo Array ................................... 125
 (2) Subsequent In"Court Identifications .................. 126
 D. Examination of Storage Facility Employee .................. 127
 (1) Leading Questions .................................... 127
 (2) Comments Regarding Meeting ........................... 128
 E. Testimony of the Government's Fingerprint Expert .......... 128
 F. Admission of DNA Evidence ................................. 129
 G. Confrontation Clause ...................................... 130
 (1) Moneeb ............................................... 131
 (2) Butler ............................................... 131
 (3) Moharam .............................................. 132
 H. Requested Read-back of Testimony .......................... 132
 V. Jury Arguments .................................................. 133
 A. Prosecutorial Misconduct as to Abouhalima ................. 134
 (1) Government Misrepresentations ........................ 134
 (a) Witnesses ....................................... 134
 (b) Affiliation With Yousef ......................... 134
 (c) Inexplicable Nervousness ........................ 134
 (2) Jury Fear ............................................ 134
 (3) Government Vouching .................................. 135
 (4) Burden of Proof ...................................... 136
 B. Prosecutorial Misconduct as to Ajaj ....................... 137
 (1) Government's Improper Arguments ...................... 137
 (2) Attacks on the Defense ............................... 138
 (3) Change in Summation Theory ........................... 139
 VI. Jury Charge ..................................................... 140
 A. The Bully Hypothetical .................................... 140
 B. Abouhalima--Terrorist Materials ........................... 144
 C. Elements of the Charged Conspiracy ........................ 145
 D. Ajaj's Objection to the Jury Charge ....................... 147
 (1) Essential Nature of Plan ............................. 147
 (2) Inclusion of the Pinkerton Charge .................... 148
 (3) Failure to Charge on Withdrawal Sua Sponte ........... 150
 VII. Sufficiency of the Evidence ..................................... 151
 A. Standard of Review ........................................ 151
 B. Ajaj ...................................................... 151
 C. Abouhalima ................................................ 155
 VIII. Unfair Trial--Due Process ....................................... 157
 IX. Post"Trial Motions .............................................. 158
 A. New Trial (Ajaj) .......................................... 158
 B. Ineffective Assistance of Counsel ......................... 160
 X. Sentencing ...................................................... 161
 Conclusion ................................ 161
 
 BACKGROUND[1]
 
 3
 On April 24, 1992, Ahmad Mohammad Ajaj departed from his home in Houston, Texas, and traveled to the Middle East to attend a terrorist training camp, known as "Camp Khaldan," on the Afghanistan-Pakistan border. There he learned how to construct homemade explosive devices. During his time in Pakistan, Ajaj met Ramzi Ahmed Yousef. Together the two plotted to use their newly acquired skills to bomb targets in the United States.
 
 
 4
 In the fall of 1992, after formulating a terrorist plan, Ajaj and Yousef traveled to New York under assumed names. Ajaj carried with him a "terrorist kit" that he and Yousef had assembled in Pakistan. The kit included, among other things, handwritten notes Ajaj had taken while attending explosives courses, manuals containing formulae and instructions for manufacturing bombs, materials describing how to carry-off a successful terrorist operation, videotapes advocating terrorist action against the United States, and fraudulent identification documents.
 
 
 5
 On September 1, 1992, Ajaj and Yousef, using false names and passports, arrived at John F. Kennedy International Airport in New York. At customs, INS inspectors discovered that Ajaj's passport had been altered and, consequently, they searched his belongings. Upon discovery of the "terrorist kit," Ajaj became belligerent. The INS seized Ajaj's "terrorist kit" and placed him under arrest. Ajaj was later indicted in the United States District Court for the Eastern District of New York for passport fraud. He pled guilty and was sentenced to six months' imprisonment.
 
 
 6
 During Ajaj's encounter with the INS inspectors, he denied that he was traveling with Yousef, who proceeded unmolested to the secondary inspection area where he presented an Iraqi passport and claimed political asylum. Yousef was arrested for entering the United States without a visa. Eventually he was released on his own recognizance.
 
 
 7
 Once in New York, Yousef assembled a team of trusted criminal associates, including Mohammed Salameh, Nidal Ayyad, Mahmoud Abouhalima and Abdul Rahman Yasin. Together, the conspirators implemented the bombing plot that Ajaj and Yousef had hatched overseas. Ayyad and Salameh opened a joint bank account into which they deposited funds to finance the bombing plot. Some of that money was later used by Salameh to rent a storage shed in Jersey City, New Jersey, where the conspirators stored chemicals for making explosives. Yousef also drew on that account to pay for materials described in Ajaj's manuals as ingredients for bomb making.
 
 
 8
 The first target of the conspirators' plot was the World Trade Center. Ayyad used his position as an engineer at Allied Signal, a large New Jersey chemical company, to order the necessary chemical ingredients for bomb making, and to order hydrogen tanks from ALG Welding Company that would enhance the bomb's destructive force. Abouhalima obtained "smokeless powder," which the conspirators used to make explosives. Smokeless powder, and all the other chemicals procured by the conspirators for the bomb, were stored in the shed rented by Salameh.
 
 
 9
 Abouhalima helped Salameh and Yousef find a ground floor apartment at 40 Pamrapo Avenue in Jersey City. The apartment fit the specifications in Ajaj's manuals for an ideal base of operations. In the 40 Pamrapo apartment, Abouhalima, Salameh, Yousef and Yasin mixed the chemicals for the World Trade Center bomb, following Ajaj's formulae. Abouhalima also obtained a telephone calling card, which the conspirators used to contact each other and to call various chemical companies for bomb ingredients.
 
 
 10
 During this entire period, although Ajaj remained incarcerated, he kept in telephone contact with Yousef. By doing so, Ajaj stayed abreast of the conspirators' progress in carrying out the terrorist plot and attempted to get his "terrorist kit" into Yousef's hands. Because Ajaj was in jail and his telephone calls were monitored, Ajaj and Yousef spoke in code when discussing the bomb plot.
 
 
 11
 On February 23, 1993, Salameh rented a yellow van at DIB Leasing, a Ryder dealership in Jersey City. The conspirators loaded their homemade bomb into that van. On February 26, 1993, the conspirators drove the bomb-laden van into a below-ground parking lot on the B-2 level of the World Trade Center Complex and, using a timer, set the bomb to detonate. At 12:18 p.m., the bomb exploded, killing six people, injuring over a thousand others, and causing hundreds of millions of dollars in damage.
 
 
 12
 After the explosion, Ayyad took credit for the bombing on behalf of the conspirators by, among other things, writing an anonymous letter to the New York Times explaining that the attack was undertaken in retaliation for American support of Israel. The letter threatened future terrorist "missions."
 
 
 13
 Immediately after the bombing, Yousef, Abouhalima and Yasin fled the country. Abouhalima was apprehended in Egypt prior to the trial and turned over to federal agents by Egyptian authorities, but Yousef and Yasin remained fugitives. Salameh arranged to flee as well, but was arrested the day before he planned to depart when he made the ludicrous mistake of going back to the Ryder truck rental office to get his rental deposit back. On March 1, 1993, Ajaj completed his term of imprisonment on the passport fraud conviction and was released. Approximately one week later, on March 9, Ajaj was taken into government custody on an INS detainer.
 
 
 14
 In September 1993, Ayyad, Abouhalima, Ajaj, Salameh, Yousef and Yasin were indicted in the United States District Court for the Southern District of New York (Duffy, J.), on various charges relating to their participation in the plot to bomb the World Trade Center. Yousef and Yasin were still fugitives at the time of trial.[2]
 
 
 15
 The trial lasted six months and involved over 1000 exhibits and the testimony of more than 200 witnesses. The defendants were convicted on all counts and each was sentenced to 240 years' imprisonment. Defendants now appeal their convictions and sentences, raising a variety of issues.
 
 I.
 SUPPRESSION MOTIONS
 
 16
 A. Motions to Suppress Materials Seized from Ajaj
 
 1. Ajaj's Motion
 
 17
 Ajaj claims that Judge Duffy should have suppressed the terrorist materials seized from him at Kennedy Airport. He maintains that the materials were obtained and then held pursuant to an illegal grand jury subpoena. Ajaj's argument has no merit.
 
 
 18
 On October 6, 1992, Ajaj pled guilty in the United States District Court for the Eastern District of New York (Raggi, J.) to one count of passport fraud. After the guilty plea, Judge Raggi ordered the government to return Ajaj's belongings or to come forward with a reason for failing to do so.
 
 
 19
 On December 22, 1992, an Assistant United States Attorney for the Eastern District of New York served a grand jury subpoena on Ajaj calling for production of many of the terrorist materials seized at Kennedy Airport. Although the subpoena purported to be a subpoena ad testificandum, it was accompanied by a duces tecum rider that specified the materials Ajaj was ordered to produce. When Ajaj's counsel in the passport fraud case inquired whether the subpoena really sought Ajaj's testimony as well as the evidence listed in the rider, the government explained that the subpoena sought only the specified evidence. Ajaj did not move to quash the subpoena.
 
 
 20
 After Ajaj learned that the government was planning to introduce the terrorist materials in the World Trade Center bombing trial, he moved to suppress the materials held pursuant to the grand jury subpoena. Ajaj argued that the subpoena was illegal since: (1) Ajaj could not have been under investigation when the subpoena was issued because it was issued after the completion of the passport fraud case but before the World Trade Center was bombed; and (2) the subpoena was a subpoena ad testificandum, not a subpoena duces tecum. Judge Duffy denied Ajaj's motion to suppress, finding that the use of the subpoena was proper. Ajaj renews his claim on appeal.
 
 
 21
 It is "improper for the government to use a grand jury subpoena 'for the sole or dominant purpose of preparing for trial.' " United States v. Sasso, 59 F.3d 341, 351 (2d Cir.1995) (quoting United States v. Leung, 40 F.3d 577, 581 (2d. Cir.1994)). However, "[w]here there [is] some proper dominant purpose for the postindictment subpoena ... the government is not barred from introducing evidence obtained thereby." Id. at 351-52. A grand jury subpoena is presumed to have a proper purpose, and the defendant bears the burden of showing that the grand jury has exceeded its legal powers. See United States v. R. Enterprises, Inc., 498 U.S. 292, 300-01, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991). A defendant must present "particularized proof" of an improper purpose to overcome the presumption of propriety of the grand jury subpoena. See United States v. Mechanik, 475 U.S. 66, 75, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986).
 
 
 22
 Ajaj failed to present any proof that the government misused the grand jury subpoena. He maintains that the subpoena had no legitimate purpose because in December 1992, when the subpoena was issued, his passport fraud prosecution was over and the World Trade Center had not yet been bombed. He therefore posits that he could not have been under investigation when the subpoena was issued and therefore that the sole purpose of the subpoena was to circumvent Judge Raggi's order for the return of the materials.
 
 
 23
 The government presented evidence that demonstrated a proper purpose for the grand jury subpoena. It consisted primarily of an affidavit from the Assistant United States Attorney who prepared the subpoena, explaining that the materials seized from Ajaj were used in a joint FBI-NYPD investigation of terrorism. The affidavit further noted that the subpoena was not connected to the Eastern District passport fraud case. This evidence established that the subpoena had a proper purpose. See Sasso, 59 F.3d at 352.
 
 
 24
 While the government should not have ignored Judge Raggi's order to return Ajaj's belongings or to explain its reasons for failing to do so, any relief that Ajaj was entitled to seek would have been some sort of remedial order directed to the entity that violated Judge Raggi's order--the United States Attorney's Office for the Eastern District of New York. Ajaj did not seek such an order. The subsequent grand jury proceeding in the Southern District of New York was a wholly independent investigation into terrorist activity. Such an investigation was clearly within the province of the Southern District grand jury. See, e.g, Branzburg v. Hayes, 408 U.S. 665, 668, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) (grand jury can investigate " 'merely on suspicion that the law is being violated, or even because it wants to assure that is not' " (citation omitted)). With respect to the Southern District investigation, Ajaj has not met his burden of showing that the government's use of the grand jury was improper. Accordingly, he has not overcome the presumption of regularity applicable to grand jury proceedings. See Leung, 40 F.3d at 581.
 
 
 25
 Ajaj also argues that the subpoena was somehow illegal because it purported to be a subpoena ad testificandum when it actually was a subpoena duces tecum. Ajaj fails to explain why the subpoena was invalid because of this technical error. A subpoena ad testificandum may order a person to bring objects with him for the use of the grand jury. See 2 Charles Alan Wright, Federal Practice and Procedure § 274, at 150 (2d ed.1982). On its face, the subpoena issued to Ajaj appeared to request both his presence and the production of physical evidence. Although it turned out that Ajaj's testimony was superfluous, the subpoena was not improper because the grand jury requested production of Ajaj personally in addition to the terrorist materials. See id. at 151.
 
 
 26
 Moreover, Ajaj suffered no prejudice as a result of the mischaracterization of the subpoena. The rider made it clear that the subpoena sought the terrorist materials Ajaj brought into the United States. Moreover, when Ajaj's counsel inquired whether the subpoena sought testimony from Ajaj, the government explained that it did not. Thus, the government's inadvertence did not prejudice Ajaj, and was not grounds to suppress the evidence held pursuant to the subpoena.
 
 2. Abouhalima's Motion
 
 27
 Judge Duffy admitted some of the materials seized from Ajaj into evidence against all the defendants. Abouhalima argues that the admission of Ajaj's terrorist materials violated Federal Rule of Evidence 403, and his rights under the First Amendment of the Constitution.
 
 
 28
 a. Rule 403
 
 
 29
 The trial judge admitted the following terrorist materials seized from Ajaj into evidence against all the defendants: (1) a videotape of the bombing of an American embassy which also provided instruction on how to make explosives and timing devices; (2) Ajaj's handwritten notebooks on how to make explosives (including urea nitrate) and improvised weapons; (3) a videotape containing a chemistry lesson on manufacturing explosives; (4) manuals on catalysts, detonators and other bomb ingredients; (5) a document entitled "Facing the enemies of God terrorism is a religious duty and force is necessary," which urged acts of terrorism against the enemies of Islam; and (6) a book entitled "Rapid Destruction and Demolition," which described the destruction of buildings and contained a formula for using explosives to accomplish this end.
 
 
 30
 In addition, Judge Duffy admitted copies of: (1) "Facing the enemies of God"; and (2) "Rapid Destruction and Demolition" that were recovered from Abouhalima's residence. The copy of "Rapid Destruction and Demolition" found in Abouhalima's residence bore his fingerprint on the page containing the formula for destroying buildings with explosives. Abouhalima argues that Judge Duffy should not have admitted these terrorist materials because they were highly prejudicial and lacked probative value. He is incorrect.
 
 
 31
 Under Rule 403, relevant evidence may be excluded when its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403. A district court is obviously in the best position to do the balancing mandated by Rule 403. See, e.g., United States v. Birney, 686 F.2d 102, 106 (2d Cir.1982). We will second-guess a district court "only if there is a clear showing that the court abused its discretion or acted arbitrarily or irrationally." United States v. Valdez, 16 F.3d 1324, 1332 (2d Cir.1994). To avoid acting arbitrarily, the district court must make a "conscientious assessment" of whether unfair prejudice substantially outweighs probative value. Birney, 686 F.2d at 106.
 
 
 32
 Although it does not bear directly on the charged elements of a crime, evidence offered to prove motive is commonly admitted. See id. at 106-07. In addition, evidence that provides background information necessary to the jury's understanding of the nature of the conspiratorial agreement properly is admitted "to furnish an explanation of the understanding or intent with which certain acts were performed." United States v. Daly, 842 F.2d 1380, 1388 (2d Cir.1988).
 
 
 33
 Where a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant. See, e.g., United States v. Cunningham, 723 F.2d 217, 230 (2d Cir.1983).
 
 
 34
 The record amply demonstrates that Judge Duffy made a "conscientious assessment" of the proffered evidence and properly determined that unfair prejudice did not substantially outweigh the probative value of these materials. See Birney, 686 F.2d at 106. Before admitting any materials, Judge Duffy scrupulously reviewed each item and heard extensive argument from counsel. Having heard both sides, Judge Duffy excluded a number of the materials seized from Ajaj as unduly prejudicial. The materials that were admitted established the existence of the conspiracy to bomb American targets and demonstrated the defendants' intent and motivation to use violence to protest American foreign policy in the Middle East.
 
 
 35
 For example, the documents seized from Ajaj provided instruction on: (1) constructing bombs; (2) mixing explosives; and (3) using bombs to destroy buildings. Specific pages of these materials contained formulae for the same explosives that were used to construct the World Trade Center bomb, and Ajaj's and Yousef's fingerprints were found on those pages. Moreover, traces of those same explosives were found in the homes of, and on objects linked to, Yousef, Abouhalima, Salameh and Ayyad. Thus, the terrorist materials provided circumstantial proof of a connection among the conspirators and their familiarity with bomb making and the use of explosives.
 
 
 36
 In addition, the copies of "Facing the enemies of God," and "Rapid Destruction and Demolition," that were recovered from Abouhalima's residence linked the conspirators. The copy of "Rapid Destruction and Demolition" seized from Abouhalima bore his fingerprint on the page containing the formula for destroying buildings with explosives. Under the circumstances, the fact that Ajaj and Abouhalima both possessed the same documents was probative of their relationship as co-conspirators.
 
 
 37
 The materials possessed by both Ajaj and Abouhalima bristled with strong anti-American sentiment and advocated violence against targets in the United States. These same themes were expressed in a letter attributed to another co-conspirator, Ayyad, that was sent to the New York Times in the aftermath of the bombing. The materials, in addition to establishing a link between the co-conspirators, evidenced the conspiracy's motive and intent to bomb targets in the United States. In addition, the materials provided the jury with background and "an explanation of the understanding or intent with which certain acts were performed." Daly, 842 F.2d at 1388.
 
 
 38
 Furthermore, the materials had probative value in light of their similarity to the actual bombing. As Judge Duffy recognized, one videotape admitted in evidence showed a man driving a truck into a building that was flying an American flag. The building was then demolished in an explosion. The videotape thus closely resembled the actual events at the World Trade Center and provided further evidence of motive and intent.
 
 
 39
 The sulphurous anti-American sentiments expressed in the terrorist materials no doubt threatened to prejudice the jury against the defendants. However, Judge Duffy did not abuse his discretion by concluding that the significant probative value of this evidence was not substantially outweighed by the danger of unfair prejudice.
 
 
 40
 b. First Amendment
 
 
 41
 Abouhalima argues also that the admission of Ajaj's terrorist materials violated Abouhalima's First Amendment rights. Ajaj's possession of the terrorist materials, Abouhalima contends, was used as the basis for an inference that Abouhalima and the other conspirators engaged in criminal acts. It is difficult to comprehend this argument since it is beyond cavil that "[t]he First Amendment ... does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." Wisconsin v. Mitchell, 508 U.S. 476, 489, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993). Neither Ajaj nor Abouhalima was prosecuted for possessing or reading terrorist materials. The materials seized from Ajaj were used appropriately to prove the existence of the bombing conspiracy and its motive. Moreover, any prejudicial effect they might have had was ameliorated by the trial court's instruction that mere possession of the literature is not illegal and that the defendants' political beliefs were not on trial.
 
 3. Ayyad's Motion
 
 42
 Ayyad argues that admission of Ajaj's terrorist materials violated Federal Rule of Evidence 801(d)(2)(E). This claim is meritless because the materials were admissible for a non-hearsay purpose.
 
 
 43
 Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(d)(2)(E) provides that, notwithstanding the definition in Rule 801(c), "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy," is equally not hearsay. Obviously, if the proffered evidence is not hearsay in the first place, under Rule 801(c), the various requirements of Rule 801(d)(2)(E) need not be met. See Anderson v. United States, 417 U.S. 211, 219, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974).
 
 
 44
 The terrorist materials seized from Ajaj discussed two issues: (1) the desirability of attacking enemies of Islam; and (2) how to produce and use explosives. However, the government introduced this evidence to prove the state of mind of those who harbored these materials, relevant to prove: (1) the existence of the bombing conspiracy; and (2) the conspirator's intent and motives. See Tr. 7320-21.
 
 
 45
 "Where, as here, the statement is offered as circumstantial evidence of [a defendant's] state of mind, it does not fall within the definition given by Rule 801(c); because it was not offered to prove the truth of the matter asserted." United States v. Detrich, 865 F.2d 17, 21 (2d Cir.1988); see United States v. Pedroza, 750 F.2d 187, 200 (2d Cir.1984). As proof of defendants' state of mind, Ajaj's terrorist materials were not hearsay under Rule 801(c), and their failure to come within Rule 801(d)(2)(E) is of no consequence. See Anderson, 417 U.S. at 219, 94 S.Ct. 2253.
 
 
 46
 B. Motion to Suppress Contents of the Storage Shed
 
 
 47
 At trial, the government introduced homemade nitroglycerine and large quantities of bomb making ingredients seized from a storage shed (the "Shed"), at the Space Station storage facility in Jersey City (the "Space Station"). Salameh argues that Judge Duffy should have suppressed this evidence. Salameh is wrong.
 
 
 48
 On March 5, 1993, a Magistrate Judge in the District of New Jersey issued a search warrant for the Shed. Probable cause for the warrant was based upon an affidavit of FBI Special Agent Eric Pilker.
 
 
 49
 Before trial, Salameh moved to suppress the evidence from the Shed on the ground that Pilker's affidavit did not establish probable cause for the search. Salameh also requested a hearing to test alleged misstatements in Pilker's affidavit. Judge Duffy denied the motion to suppress as well as the requested hearing, finding that: (1) Salameh lacked standing to contest the search; (2) there was probable cause for the search warrant; and (3) even if the warrant was not supported by probable cause, the search was proper because it was conducted in good faith reliance on the search warrant. Because we agree that there was both probable cause and good faith, we need not and do not address the standing argument.
 
 1. Probable Cause
 
 50
 In deciding whether probable cause exists for a search warrant, a judge must determine whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "[O]nly the probability, and not the prima facie showing, of criminal activity is the standard of probable cause." Id. at 235, 103 S.Ct. 2317 (internal quotation marks and citation omitted). In assessing the proof of probable cause, the government's affidavit in support of the search warrant must be read as a whole, and construed realistically. See id. at 230-31, 103 S.Ct. 2317.
 
 
 51
 We accord "great deference" to a judge's determination that probable cause exists, and we resolve any doubt about the existence of probable cause in favor of upholding the warrant. See United States v. Jakobetz, 955 F.2d 786, 803 (2d Cir.1992). Our duty is "simply to ensure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed." Gates, 462 U.S. at 238-39, 103 S.Ct. 2317 (citation omitted; alterations in original).
 
 
 52
 Pilker's affidavit in support of the search warrant stated that an explosion had occurred at the World Trade Center, and that an FBI explosives expert had determined that it was caused by a bomb. The affidavit also related that the expert knew from examining an auto part recovered at the crime scene that the part belonged to whatever vehicle carried the bomb. Using the part's vehicle identification number, investigators traced it to a yellow Ford Econoline 350 van registered in Alabama to the Ryder Truck Rental Company and leased by Mohammad Salameh from a rental office in Jersey City for a one-week period beginning three days before the explosion.
 
 
 53
 Elsewhere in the affidavit, Pilker related that a Space Station employee informed the FBI that storage shed number 4344 was under lease to "Kamil Ibrahim." The employee told the FBI that on February 25, 1993, one day before the bombing, he observed "Kamil Ibrahim," along with other males, making numerous trips to the Shed using a yellow Ryder van. Moreover, the same Space Station employee stated that on March 4, 1993, less than one week after the bombing, he entered the Shed and observed containers marked "sulfuric acid," "nitric acid" and "urea." A forensic chemist at the Bureau of Alcohol, Tobacco and Firearms informed the FBI that those three substances could be combined to produce a powerful bomb.
 
 
 54
 Finally, the affidavit described that, when renting the Ryder van, Salameh had given a telephone number that belonged to someone named Jodie Hadas at 34 Kensington Avenue, Apt. 4, in Jersey City. When investigators searched that apartment on March 4, 1993, they found tools, wiring and manuals concerning antennae, circuitry and electromagnetic devices. A law enforcement bomb technician advised the FBI that these items indicated that a bomb maker lived in that apartment.
 
 
 55
 Cumulatively, this evidence provided ample probable cause to believe that the Shed contained evidence of the World Trade Center bombing.
 
 2. Franks Hearing
 
 56
 Salameh argues that Pilker's affidavit contained recklessly false statements regarding the alleged evidence of bomb making discovered at the Kensington Avenue apartment. Salameh asserts that Judge Duffy should have granted him a hearing under Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to test the accuracy of Pilker's claims.
 
 
 57
 To be entitled to a Franks hearing, a defendant must make a "substantial preliminary showing" that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding. See United States v. Levasseur, 816 F.2d 37, 43 (2d Cir.1987). If, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause, the district court need not conduct a Franks hearing. See id.
 
 
 58
 In his affidavit, Pilker related that the Kensington Avenue apartment contained evidence of a bomb maker. Salameh maintains that this statement was false, and that Pilker was reckless in including it in his affidavit.
 
 
 59
 In support of his claim of recklessness, Salameh proffered the affidavit of Musab Yasin, an electrical engineering professor who claimed to reside in the Kensington Avenue apartment. Yasin averred that the materials discovered by the government were used in his electrical engineering studies. He also said that he informed Pilker of this fact on two separate occasions, but Pilker failed to include Yasin's benign explanation of the materials in the affidavit in support of the search warrant.
 
 
 60
 The district judge did not err in denying Salameh a Franks hearing because the allegedly false statements in Pilker's affidavit were not necessary for a finding of probable cause. See United States v. Trzaska, 111 F.3d 1019, 1027-28 (2d Cir.1997). As detailed above, there was a wealth of evidence presented in Pilker's affidavit which raised a reasonable probability that the Shed contained evidence of the World Trade Center bombing. Disregarding the allegedly false statements in Pilker's affidavit, the other evidence presented by the government amply supported a finding of probable cause. See United States v. Marin-Buitrago, 734 F.2d 889, 895 (2d Cir.1984).
 
 3. Good Faith Reliance
 
 61
 Even assuming, arguendo, that probable cause was lacking for the issuance of the search warrant, Judge Duffy properly declined to suppress the evidence discovered in the Shed because the search of the Shed was conducted in good faith reliance on the search warrant.
 
 
 62
 If a reviewing court determines that a search warrant was not supported by probable cause, a motion to suppress will still be denied if the court finds that the officers who conducted the search acted in good faith reliance on a facially valid warrant. See United States v. Leon, 468 U.S. 897, 918-23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). An officer's reliance on a warrant is not in good faith when the application supporting the warrant is " 'so lacking in indicia of probable cause as to render official belief in [the existence of probable cause] entirely unreasonable.' " Id. at 923, 104 S.Ct. 3405 (quoting Brown v. Illinois, 422 U.S. 590, 610-11, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)).
 
 
 63
 For the reasons explained above, the application for the warrant presented ample indicia of probable cause. Thus, the agents' reliance on the warrant in conducting the search of the Shed was reasonable and in good faith.
 
 II.
 PROCEDURAL MOTIONS
 A. Abouhalima--Severance
 
 64
 Abouhalima argues that the district court deprived him of a constitutionally fair trial by denying his pretrial motion for a severance. Specifically, Abouhalima first claims that absent severance, he was harmed by the admission and the subsequent "spillover" effect of "holy war" literature and video tapes that were seized from Ajaj at Kennedy Airport in September 1992. These materials included (1) a videotape of the bombing of the American Embassy, which contained instructions regarding how to make explosives and timing devices and how to construct a bomb; (2) Ajaj's manuals, detailing how to prepare explosives, including urea nitrate, and improvised weapons; (3) a videotape containing a chemistry lesson on manufacturing explosives; (4) additional manuals on catalysts, detonators and other bomb ingredients; (5) a document entitled "Facing the enemies of God--[T]errorism is a[R]eligious [D]uty and [F]orce is [N]ecessary," which urged acts of terrorism against the enemies of Islam; and (6) a book entitled "Rapid Destruction and Demolition," which described the destruction of buildings and contained a formula for using explosives to accomplish this end. Copies of publications (5) and (6) above were recovered from Abouhalima's residence and admitted into evidence. Although identical, Abouhalima does not dispute the admissibility of these items, but only those items seized from Ajaj.
 
 
 65
 Next, Abouhalima argues that through the joinder, he was prejudiced by Salameh's closing argument, where Salameh purportedly asserted a defense antagonistic to his own. In this regard, as part of his defense, Abouhalima refused to concede either that a bomb had caused the World Trade Center explosion, or that he had any association with Yousef. Salameh, on the other hand, conceded not only the existence of a bomb, but argued that he was an unwitting dupe of Yousef, who had masterminded the bombing. Because the government had characterized Yousef as Abouhalima's close associate, Abouhalima avers that Salameh's summation undermined his defense of not knowingly participating in the conspiracy.
 
 
 66
 We find no basis for reversal. "There is a preference in the federal system for joint trials of defendants who are indicted together." Zafiro v. United States, 506 U.S. 534, 537, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); United States v. Hernandez, 85 F.3d 1023, 1029 (2d Cir.1996). This preference is particularly strong where, as here, the defendants are alleged to have participated in a common plan or scheme. See Fed.R.Crim.P. 8(b); United States v. Cardascia, 951 F.2d 474, 482 (2d Cir.1991); United States v. Turoff, 853 F.2d 1037, 1042 (2d Cir.1988). "It would impair both the efficiency and the fairness of the criminal justice system to require ... that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand." Richardson v. Marsh, 481 U.S. 200, 210, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).
 
 
 67
 Whether to grant or deny a severance motion is "committed to the sound discretion of the trial judge." United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir.1989); see United States v. Torres, 901 F.2d 205, 230 (2d Cir.1990). The district court's exercise of that discretion is "virtually unreviewable." United States v. Lasanta, 978 F.2d 1300, 1306 (2d Cir.1992) (citation and internal quotation marks omitted).
 
 
 68
 Accordingly, a district court's denial of a severance motion under Federal Rule of Criminal Procedure 14 will be reversed "only if a defendant can 'show prejudice so severe that his conviction constituted a miscarriage of justice, and that the denial of his motion constituted an abuse of discretion.' " Hernandez, 85 F.3d at 1029 (quoting United States v. Rosa, 11 F.3d 315, 341 (2d Cir.1993)). To satisfy this "extremely difficult burden, of showing an abuse of discretion, an appellant must demonstrate that the denial of the motion caused substantial prejudice," Casamento, 887 F.2d at 1149-50 (internal quotation marks and citations omitted), that is, "prejudice so great as to deny him a fair trial," Cardascia, 951 F.2d at 482. "If the denial of the motion causes some prejudice, but less than substantial prejudice, we are not apt to reverse, since, by and large, joinder promotes judicial efficiency." Casamento, 887 F.2d at 1150.
 
 1. Ajaj's Holy War Materials
 
 69
 The admission of Ajaj's "holy war" materials did not result in prejudicial spillover as to Abouhalima. Therefore, the district court did not err in denying severance. A defendant's claim that he was prejudiced by the admission of evidence at a joint conspiracy trial is insupportable when the evidence would have been admissible against him in a separate trial alone as a member of the conspiracy. See Rosa, 11 F.3d at 341 (such evidence "is neither spillover nor prejudicial"); United States v. Cunningham, 723 F.2d 217, 230 (2d Cir.1983). "Prejudice" occurs in joint trials when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper. See, e.g., United States v. Cervone, 907 F.2d 332, 341-42 (2d Cir.1990). This is an unlikely occurrence when all the defendants are charged under the same conspiracy count. See United States v. DiNome, 954 F.2d 839, 843-44 (2d Cir.1992).
 
 
 70
 In the present case, Ajaj and Abouhalima were alleged to have participated in a common plan or scheme and were tried under the same conspiracy count. As we have already discussed in connection with co-appellant Ayyad, the materials seized from Ajaj at Kennedy Airport were properly admitted as background evidence to establish the nature and scope of the conspiracy and to establish the motive and intent of the conspirators, namely, a desire to use violence to effect change in American foreign policy in the Middle East. See United States v. Daly, 842 F.2d 1380, 1387 (2d Cir.1988) ("Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed."). Additionally, the materials were admissible to link Abouhalima to the conspiracy, as two of the terrorist publications seized from Ajaj were identical to the publications found in Abouhalima's apartment. Because each of the items would have been admitted against Abouhalima had he been tried alone, they were properly admitted against Abouhalima in the joint trial and there is no prejudicial "spillover." Consequently, Abouhalima has not shown that the district court erred in denying his pretrial motion for a severance, let alone an abuse of discretion and a miscarriage of justice.
 
 2. Salameh's Summation
 
 71
 We find no prejudice to Abouhalima arising from Salameh's summation. " '[M]utually antagonistic' or 'irreconcilable' defenses may be so prejudicial in some circumstances as to mandate severance." Zafiro, 506 U.S. at 538, 113 S.Ct. 933. In order to make a showing of "mutually antagonistic" or "irreconcilable defenses," the defendant must make a factual demonstration that "acceptance of one party's defense would tend to preclude the acquittal of [the] other." United States v. Smith, 788 F.2d 663, 668 (10th Cir.1986) (internal quotation marks and citation omitted); United States v. Keck, 773 F.2d 759, 765 (7th Cir.1985). However, "[m]utually antagonistic defenses are not prejudicial per se. Moreover, Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." Zafiro, 506 U.S. at 538-39, 113 S.Ct. 933; see, e.g., id. at 540-41, 113 S.Ct. 933 (where two co-defendants both claim they are innocent and each accuses the other of the crime, district court did not err in denying motion for severance). "The risk of prejudice will vary with the facts in each case ... [and w]hen the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but, as [the Supreme Court] indicated in Richardson v. Marsh, less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." Id. at 539, 113 S.Ct. 933. " '[J]uries are presumed to follow their instructions.' " Id. at 540, 113 S.Ct. 933 (citation omitted).
 
 
 72
 Throughout the trial in this case, all four defendants challenged the government's case without attempting to accuse one another. Unlike Abouhalima, during summation Salameh abandoned his trial strategy of disputing that a bomb had caused the explosion and argued that he was nothing more that an unwitting dupe of Yousef, who had masterminded the bombing. While the defense asserted by Salameh was, in the end, inconsistent with Abouhalima's defense, at no time did Salameh argue or suggest that Abouhalima was involved in the bombing, or directly contradict Abouhalima's defense strategy. Salameh and Abouhalima both claimed to be innocent of the charges and neither's claim of innocence required the jury to find the other guilty.
 
 
 73
 Consequently, because there was nothing directly antagonistic between the two defense theories so as to create mutually antagonistic or irreconcilable defenses, we perceive no ground for reversal based on the court's denial of severance. Furthermore, any possible prejudice was eliminated by the district court's repeated admonitions to the jury that each defendant's guilt had to be separately and individually considered.[3] See, e.g., Hernandez, 85 F.3d at 1029-30 (rejecting claim of prejudicial spillover where "the district court instructed the jury that it was required to consider the evidence against each defendant individually for each count"); United States v. Losada, 674 F.2d 167, 171 (2d Cir.1982) (same).
 
 
 74
 Moreover, to the extent that Salameh's summation may have undermined Abouhalima's defense by indirectly linking him to Yousef, any possible prejudice was cured by the district court's jury instruction that "[m]ere association with other people that you found are members of the conspiracy is not enough for you to find a person to be a member ... [even] a person who has knowledge of a conspiracy and all of its ramifications and does nothing about it is not a co-conspirator.... [It's] got to be an intentional joining of the conspiracy." In light of this instruction, we find no error.
 
 B. Abouhalima--Involuntariness of Statement
 
 75
 Abouhalima made two incriminating remarks during his post-arrest interview. Specifically, shortly after being taken into United States' custody, Abouhalima was informed that he was under arrest for his participation in the World Trade Center bombing. Once FBI agents advised him of his constitutional rights, they interviewed him about the apartment at 40 Pamrapo. During the interview, Abouhalima asked an officer whether he knew an individual by the name of "Rashid." Yousef's nickname was "Rashed."[4] Abouhalima also corrected an FBI agent's pronunciation of "Pamrapo." At trial, Abouhalima requested a suppression hearing directly before these remarks were admitted into evidence. The court, however, found that such a hearing was unnecessary. After introducing these statements into evidence, the government used these statements to assert that Abouhalima had linked the questioning about 40 Pamrapo to the World Trade Center bombing and to Yousef.
 
 
 76
 Abouhalima now argues that we should direct the district court on remand to reconsider Abouhalima's motion to suppress his post-arrest remarks. Specifically, Abouhalima asserts that his comments were given involuntarily and without a valid Miranda waiver because they followed ten days of incarceration and torture in Egypt. Accordingly, Abouhalima argues that the court's failure to hold a suppression hearing violated his Fifth and Sixth Amendment rights.
 
 
 77
 Under the circumstances, we find no basis for a suppression hearing. "[Courts are not required to] divine a defendant's motivation for speaking or acting as he did [when] there [is] no claim that governmental conduct coerced his decision." Colorado v. Connelly, 479 U.S. 157, 165-66, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). "A diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." United States v. Chrismon, 965 F.2d 1465, 1469 (7th Cir.1992).
 
 
 78
 In the present case, while it is reasonable that Egyptian incarceration and torture, if true, would likely weaken one's mental state, one's mental state does not become part of the calculus for the suppression of evidence unless there is an allegation that agents of the United States engaged in some type of coercion. Because Abouhalima does not contend that federal agents either mentally or physically coerced his remarks during that interrogation, there is no basis for inquiry into a possible constitutional violation. "Only if we were to establish a brand new constitutional right--the right of a criminal defendant to confess to his crime only when totally rational and properly motivated--could respondent's present claim be sustained." Connelly, 479 U.S. at 166, 107 S.Ct. 515.C. Ayyad--Failure to Grant Funds for Experts
 
 
 79
 Ayyad argues that the district court unreasonably interfered with his efforts to secure expert testimony and consultation by authorizing only a portion of the Criminal Justice Act (CJA) funds that he requested. Specifically, on January 28, 1994, during the fourth month of the trial, Ayyad, who was represented by retained counsel, applied for $35,000 in CJA funds for five expert witnesses concerning DNA evidence, explosives, computers, linguistics and culture. The district court initially responded by authorizing $1,000 for the DNA expert and $1,000 for the explosives expert, but denied Ayyad's request to retain the computer expert, linguist and an expert on culture (sociologist). Ayyad asserts that the district court's response "left him unprepared and unable to test the government's direct case ... requir[ing] reversal."
 
 
 80
 The government responds that just three days after its initial ruling, the court reconsidered and granted Ayyad's application in full. Accordingly, the government avers that Ayyad's argument is factually incorrect and does not support a reversal. We agree.
 
 
 81
 The Criminal Justice Act of 1964 provides in pertinent part: "Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application." 18 U.S.C. § 3006A(e)(1). The statute requires the district court to authorize these funds when a defense attorney "makes a reasonable request in circumstances in which he would independently engage such services [if his client was able to pay for them]." United States v. Durant, 545 F.2d 823, 827 (2d Cir.1976) (citing United States v. Theriault, 440 F.2d 713, 717 (5th Cir.1971) (Wisdom, J., concurring)); see United States v. Oliver, 626 F.2d 254, 259 (2d Cir.1980). While the district judge should entertain such requests with a liberal attitude, he is nevertheless "obligated to exercise his discretion in determining whether such services are necessary." Oliver, 626 F.2d at 260. Services "necessary for an adequate defense" include "preparation for cross-examination of a government expert as well as presentation of an expert defense witness." Id.; see id. at 828 (district court commits reversible error when it denies CJA funds for fingerprint expert, where fingerprint evidence was likely to be "pivotal").
 
 
 82
 In this case, we need not decide whether the district court erred in initially declining to grant Ayyad's application in full. Because the district court timely reconsidered that order and granted Ayyad the full $35,000 in CJA funds, we perceive no prejudice. Moreover, we observe that during the three-week interval between the district court's authorization of the funds and the time that Ayyad rested before the jury, he called no witnesses and never requested a continuance to consult with his experts. Consequently, there is no basis for reversal.
 
 D. Ajaj--Eastern District Plea Agreement
 
 83
 Ajaj argues that his prosecution under the instant indictment is barred by the express terms of his plea agreement regarding the passport fraud charges in the Eastern District of New York ("Eastern District plea agreement"). He claims that the United States Attorney's Office for the Eastern District of New York ("Eastern District prosecutor's office") improperly passed along work to the United States Attorney's Office for the Southern District of New York ("Southern District prosecutor's office") to circumvent a restriction on its own ability to prosecute Ajaj on charges stemming from Ajaj's role in the World Trade Center bombing. For the reasons that follow, we conclude that Ajaj's arguments are meritless.
 
 
 84
 Following his arrest and detention at Kennedy Airport, Ajaj was charged in the Eastern District of New York with knowingly using a false passport, 18 U.S.C. § 1543 (Count One), and using the passport of another person, 18 U.S.C. § 1544 (Count Two) ("Eastern District indictment"). On October 6, 1992, Ajaj, with the assistance of his then-counsel, Douglas Morris, executed a written plea agreement with the Eastern District prosecutor's office. Ajaj agreed to plead guilty to Count Two in return for the Eastern District prosecutor's promise to move to dismiss Count One at sentencing and not oppose a two-level reduction under the Sentencing Guidelines for Ajaj's acceptance of responsibility. Paragraph 4 of that plea agreement provided that "[t]his agreement is limited to the United States Attorney's Office for the Eastern District of New York and cannot bind other federal, state or local prosecuting authorities."
 
 
 85
 On October 6, 1992, Ajaj pled guilty to Count Two of the Eastern District indictment before United States District Judge Raggi. During the course of the allocution, Judge Raggi asked the parties whether they had agreed to any additional terms to supplement the written plea agreement. Attorney Morris, counsel for Ajaj, responded:
 
 
 86
 There's also an agreement that the Government will not bring any charges arising out of Mr. Ajaj's entry into the United States on September 1st, including any false statement charge, and it will not bring any charges arising from any thing or document that Mr. Ajaj was carrying with him on that date.
 
 
 87
 (emphasis added). Following Attorney Morris' articulation of this supplementary oral agreement, the Eastern District prosecutor agreed, stating "[t]hat's correct, your Honor." Judge Raggi, to ascertain whether Ajaj understood the agreement in its entirety, questioned Ajaj and paraphrased Attorney Morris' articulation of the oral agreement. Judge Raggi stated:
 
 
 88
 THE COURT: Now, the lawyers tell me that the agreement represents all of the promises and agreements between you and the Government, except that the Government also promises that it's not going to bring any other charges against you relating to your conduct on September 1st.
 
 
 89
 The question I want to put to you, now, is do you know of any other promises [or] agreements made by you or the Government as a part of this decision to plead guilty?
 
 
 90
 Is there anything else?
 
 
 91
 THE DEFENDANT: No.
 
 
 92
 (emphasis added).
 
 
 93
 Prior to trial under the instant indictment filed in the Southern District of New York ("Southern District indictment"), Ajaj moved to dismiss the indictment, arguing that the prosecution was barred by the terms of the Eastern District plea agreement. Specifically, Ajaj argued that under the terms of the oral supplement to that agreement, "the Government," which included the Southern District prosecutor's office, was barred from prosecuting Ajaj on charges "arising from" and "relating to" his September 1 entry into the United States and the terrorist materials in his possession. Ajaj argued that in contravention of that agreement, two overt acts charged in Count One of the Southern District indictment stated:
 
 
 94
 a. On or about September 1, 1992, AHMAD MOHAMMAD AJAJ, using an airline ticket issued in the name of "Khurram Khan," and RAMZI AHMED YOUSEF, using an airline ticket issued in the name of "Azan Muhammad," traveled together from Pakistan to John F. Kennedy International Airport, in Queens County, New York ("Kennedy Airport").
 
 
 95
 b. On or about September 1, 1992, AHMAD MOHAMMAD AJAJ transported from Pakistan to Kennedy Airport, manuals and other materials containing, among other things, instructions on the construction and use of explosive devices, including improvised explosive devices using urea and nitric acid and nitroglycerine.
 
 
 96
 The government, in opposition to Ajaj's motion, argued that the parties to the Eastern District plea agreement never contemplated that the plea agreement would bar the prosecution of Ajaj for terrorist-related activities. According to the government, the parties had entered into the supplementary oral agreement to address Ajaj's concern that (1) he had made false statements to INS officials on September 1, 1992; (2) the government would bring additional fraud-related charges against Ajaj based on his possession of false identification documents; and (3) the possession of terrorist materials themselves might constitute a crime.
 
 
 97
 On September 13, 1993, the district court denied Ajaj's motion, concluding that "the written portion of the plea bargain specifically limited the [plea agreement] to the United States Attorney's Office for the Eastern District of New York. It is unreasonable to believe that anyone, including Ajaj, believed that the addendum announced in open court by his own attorney could bind all levels of government within the United States.... Under the circumstances leading up to Ajaj's guilty plea, the only reasonable expectation Ajaj could have was that he would not be further prosecuted by the United States Attorney in the Eastern District of New York." We agree.
 
 
 98
 It is well settled that a prosecutor's promises made in return for a defendant's guilty plea must be fulfilled. See Mabry v. Johnson, 467 U.S. 504, 509, 104 S.Ct. 2543, 81 L.Ed.2d 437 (1984) ("[W]hen the prosecution breaches its promise with respect to an executed plea agreement, the defendant pleads guilty on a false premise, and hence his conviction cannot stand."); Santobello v. New York, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). When the express terms of a plea agreement set forth promises by "the Government," we have held that the "plea agreement binds only the office of the United States Attorney for the district in which the plea is entered unless it affirmatively appears that the agreement contemplates a broader restriction," United States v. Annabi, 771 F.2d 670, 672 (2d Cir.1985) (per curiam), or unless "there [is] evidence to show that [a prosecutor] [i]s attempting to evade its own obligations [under the plea agreement] by transferring a prosecution" to another office, United States v. Alessi, 544 F.2d 1139, 1154 (2d Cir.1976); see also United States v. DiNapoli, 817 F.2d 978, 979 (2d Cir.1987) (per curiam); United States v. Papa, 533 F.2d 815, 825 (2d Cir.1976). The mere use of the term " 'government' in the plea agreement does not create an affirmative appearance that the agreement contemplated barring districts" other than the particular district entering into the agreement. United States v. Laskow, 688 F.Supp. 851, 853 (E.D.N.Y.1988), aff'd, 867 F.2d 1425 (2d Cir.1988).
 
 
 99
 Here, Ajaj presents no evidence that the parties to the Eastern District plea agreement contemplated that it would bar the prosecution of Ajaj in any district other than the Eastern District. Indeed, the explicit terms of the Eastern District plea agreement expressly limited the plea agreement to the Eastern District of New York. Moreover, assuming that the plea agreement would bar the Eastern District prosecutor's office from prosecuting Ajaj for crimes arising from the World Trade Center bombing, Ajaj presents no evidence that the Eastern District prosecutor's office attempted to circumvent a restriction on its authority to prosecute by transferring its work to the Southern District prosecutor's office. The Southern District prosecutor's office independently investigated criminal offenses arising from the World Trade Center bombing and filed an indictment in the Southern District charging Ajaj with crimes that were distinct from the passport fraud charges in the Eastern District. We therefore affirm the district court's denial of Ajaj's motion.
 
 III.
 JURY SELECTION
 
 100
 Abouhalima maintains that he was denied a fair trial because Judge Duffy, during voir dire, failed to ask sufficiently probing questions regarding the jury panel's bias against Muslims, Arabs and Islamic Fundamentalism. Abouhalima argues that, aside from uncovering bias, a more extensive voir dire would have helped the defendants exercise their peremptory challenges more effectively. Abouhalima adds that the judge should have asked questions about Ajaj's terrorist materials during voir dire. Because the record shows that Judge Duffy conducted a proper and searching voir dire, we disagree.
 
 
 101
 Before trial, the parties submitted proposed voir dire questions. Abouhalima's counsel submitted a proposed written questionnaire with 79 questions soliciting the prospective jurors' views about "Islam, Muslims and Arabs." However, Judge Duffy declined to use a written questionnaire and instead conducted jury selection in three stages.
 
 
 102
 In the first stage, potential jurors were sent to the courtroom in groups of 50. The judge explained the charges in the Indictment, read a list of names and places that might be mentioned during the trial and entertained petitions from those who sought to be excused from jury service. Judge Duffy eliminated anyone who expressed bias against the defendants or hesitancy about serving on the jury. After this stage, approximately 60 out of 150 possible jurors remained.
 
 
 103
 In the second stage of jury selection, Judge Duffy randomly placed jurors in five groups of twelve. Each group was brought separately into open court where Judge Duffy asked a series of questions, including: (1) "If you had to describe your religious views, how would you do it?"; (2) "Have you ever had an incident in your life that would make it difficult to judge another person because of their race or creed or color or national origin or anything like that?"; (3) "Have you ever moved out of an area because you were disturbed that the area was changing?"; and (4) "Do you think that you could be fair and impartial in a case like this?" Again, jurors who expressed bias or difficulty assessing the case impartially were excused.
 
 
 104
 In the third stage of jury selection, the judge questioned each remaining venire person privately in the jury room, with all counsel present. Before beginning the individual questioning, Judge Duffy emphasized that jurors had to be "totally fair and impartial" and base their decisions solely on the evidence. Judge Duffy asked each venire person whether he or she: (1) had ever traveled to the Middle East; (2) had any feelings about Israel; (3) would be affected in any way by the fact that the four defendants were Muslims; (4) had any friends who were Muslims; (5) had any business dealings with Muslims; and (6) could be fair and impartial in this case. Judge Duffy also asked each person follow-up questions when appropriate, to further assess his or her ability to be fair and impartial. At the end of the third stage of voir dire, the judge entertained counsel's challenges for cause.
 
 
 105
 Finally, before the parties exercised their peremptory challenges, Judge Duffy again asked each venire person whether he or she could be fair and impartial and whether he or she was willing to serve. Judge Duffy explained that if the answer to either of these last two questions was "no," he could excuse the venire person without further inquiry. After the jurors answered these final questions, the parties exercised their peremptory challenges.
 
 
 106
 "The conduct of the voir dire is entrusted to the broad discretion of the trial judge ... and an appellate court will not interfere with the manner in which it has been conducted absent a clear abuse of discretion." United States v. Barton, 647 F.2d 224, 230 (2d Cir.1981); see Rosales-Lopez v. United States, 451 U.S. 182, 189, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981). "[A] trial judge has broad discretion whether to pose a defendant's requested voir dire questions." United States v. Kyles, 40 F.3d 519, 524 (2d Cir.1994). Inquiry as to racial or ethnic prejudice must be made when "the circumstances of the case indicate that there is a reasonable possibility that racial or ethnic prejudice might have influenced the jury." Rosales-Lopez, 451 U.S. at 191, 101 S.Ct. 1629. However, "the trial court retains great latitude in deciding what questions should be asked on voir dire " to uncover racial or ethnic bias. Mu'Min v. Virginia, 500 U.S. 415, 424, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991); see United States v. Taylor, 92 F.3d 1313, 1324 (2d Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 771, 136 L.Ed.2d 717 (1997).
 
 
 107
 Judge Duffy did not abuse his discretion in conducting jury selection. Although he chose not to use each of Abouhalima's 79 proposed questions verbatim, Judge Duffy's inquiry as to religious, ethnic or cultural bias was proper and thorough. Furthermore, despite Abouhalima's claims, it was within the judge's sound discretion not to question potential jurors about the terrorist materials seized from Ajaj at Kennedy Airport, particularly remembering that none of the defendants submitted proposed questions on this issue. Finally, the fact that additional questions, such as those Abouhalima submitted regarding Islamic Fundamentalism, might have aided the defendants in their peremptory challenges does not render Judge Duffy's voir dire defective. See Mu'Min, 500 U.S. at 425-26, 111 S.Ct. 1899.IV.
 
 EVIDENTIARY RULINGS
 
 108
 A. Admission of Evidence Regarding Bombing Victims
 
 
 109
 At trial, the government presented testimony from several victims of the bombing, rescue workers who aided the victims, and a medical examiner who examined some of the fatalities from the attack. In addition, the government introduced photographs of several victims killed in the bombing. Salameh and Abouhalima urge that the trial court should have excluded this evidence under Federal Rule of Evidence 403.
 
 
 110
 During the first four days of the trial, the government presented a number of witnesses to describe what happened before, during and after the bombing. In addition to describing their personal experiences as a result of the attack, several witnesses recounted observing the panic and suffering of other victims. Indeed, one such witness broke down in tears while testifying.
 
 
 111
 The government also introduced thirteen photographs of the six people killed in the bombing. Four of the photographs were facial close-ups of the bombing victims, six depicted the position of one of the victims at death, one was a close-up of an injury to a victim's shoulder, and two showed victims' bodies as they lay in stretchers. One of the victims shown on a stretcher was clearly pregnant. The photographs are graphic depictions of the corpses. Undeniably, they are disturbing.
 
 
 112
 After the photographs were introduced, a medical examiner testified that in her opinion, the victims were killed by "blunt impact trauma" caused by objects traveling at great speed. The medical examiner used the photos of the victims to illustrate injuries consistent with her opinion.
 
 
 113
 The defendants protest that the evidence relating to the victims was unfairly prejudicial. As explained above, Rule 403 requires the district court to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. See Fed.R.Evid. 403. A district judge's Rule 403 analysis is reversible error only when it is a clear abuse of discretion. See Valdez, 16 F.3d at 1332.
 
 1. Probative Value
 
 114
 To prove the charges in the indictment, the government had to demonstrate that the World Trade Center bombing caused death and personal injury. Thus, the government suggests that the victim testimony and photographs had substantial probative value in proving the charges against the defendants. Salameh and Abouhalima point out that they offered to stipulate that the explosion in the World Trade Center caused injury and death. They maintain that their proffered stipulation eliminated any probative value that the victim testimony and photographs otherwise might have had.
 
 
 115
 The Supreme Court recently has reaffirmed that "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the government chooses to present it." Old Chief v. United States, 519 U.S. 172, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997) (limiting exception to this rule to cases where defendant offers to stipulate to prior felony conviction); see United States v. Gilliam, 994 F.2d 97, 101 (2d Cir.1993). "[A] piece of evidence may address any number of separate elements, striking hard because it shows so much at once." Old Chief, 519 U.S. at ----, 117 S.Ct. at 653.
 
 
 116
 The evidence regarding the victims was probative of the nature and location of the explosion that killed the victims, which the defendants disputed at trial. Government experts opined that the devastation of the World Trade Center was wrought by a bomb hidden in a van parked in the B-2 level of the World Trade Center. The defendants vigorously contested this theory. The testimony of the victims supported the government's experts' version of events. Moreover, the photographs of the victims provided corroboration for the expert witnesses' conclusions regarding the cause of the blast and the resulting casualties and damage. Thus, the testimony and photographs of the victims had substantial probative value, notwithstanding the defendants' offer to stipulate to death and injury. See United States v. Gantzer, 810 F.2d 349, 351 (2d Cir.1987).
 
 2. Danger of Unfair Prejudice
 
 117
 There is no doubt that the testimony and photographs of the victims were shocking, and a significant amount of such evidence was admitted. Nevertheless, as explained above, the evidence had substantial probative value. Probative evidence is not inadmissible solely because it has a tendency to upset or disturb the trier of fact. See Kuntzelman v. Black, 774 F.2d 291, 292 (8th Cir.1985); United States v. Brady, 579 F.2d 1121, 1129 (9th Cir.1978).
 
 
 118
 Judge Duffy weighed the prejudicial effect of the evidence and concluded that it did not substantially outweigh its probative value. His decision was not an abuse of discretion. See Valdez, 16 F.3d at 1332.
 
 B. Admission of Evidence Regarding Nosair
 1. Photographs of Salameh and Nosair
 
 119
 Salameh insists that the trial judge violated Federal Rule of Evidence 404(a)(1) by admitting photographs of Salameh with El-Sayyid Nosair, a reputed political terrorist convicted of murdering an Israeli rabbi.
 
 
 120
 On March 4, 1993, FBI agents recovered Salameh's briefcase from Yasin's Jersey City apartment. The briefcase contained a number of photographs, including: (1) a photograph of Salameh, Nosair and Mohammed Abdul Hamed, the resident of the apartment where Abouhalima's refrigerator (which was used to store bomb making materials) was later discovered; (2) a photograph of Salameh, Nosair and Ayyad; and (3) several photographs of Salameh and Nosair.
 
 
 121
 At trial, the government introduced all the pictures pursuant to a stipulation between counsel to admit the entire contents of Salameh's briefcase. No evidence was presented as to who Nosair was, what allegedly he had done or that he was in prison. Nosair's name was, however, mentioned, without further amplification, when he was identified in the photographs.
 
 
 122
 Generally, evidence of a defendant's bad character is inadmissible to prove action in conformity therewith. See Fed.R.Evid. 404(a). Evidence that tends to prove a character trait of a defendant is admissible if it is offered for another, proper purpose. See Hynes v. Coughlin, 79 F.3d 285, 290 (2d Cir.1996) (discussing Rule 404(b)). Salameh argues that the photographs of Nosair were introduced solely to prove that he had a propensity for terrorist acts and that he acted in conformity with that propensity by conspiring to bomb the World Trade Center. His argument has little merit.
 
 
 123
 The government presented the photographs to: (1) establish the association of various members of the charged conspiracy; and (2) link members of the conspiracy to Abouhalima's refrigerator, which was found in Hamed's apartment.
 
 
 124
 The photograph of Salameh, Nosair and Ayyad demonstrated the relationship between Salameh and Ayyad. As proof of the association between two conspirators, this photograph was probative of the existence of the conspiracy.
 
 
 125
 The photograph of Salameh, Nosair and Hamed established a connection between Abouhalima's refrigerator and the conspiracy. The government argued that the conspirators used Abouhalima's refrigerator to store bomb making ingredients, and then moved the refrigerator to Hamed's apartment to cover their trail. The defendants disputed any connection to the refrigerator found in Hamed's apartment. The photo of Salameh and Hamed linked the two men, and circumstantially connected Salameh and the conspiracy to the refrigerator found in Hamed's apartment.
 
 
 126
 Salameh's argument also fails because the photographs were not evidence of Salameh's character. Salameh proposes that the jury was asked to infer from the photographs that he was a terrorist because he associated with Nosair. However, no evidence was presented at trial regarding Nosair's terrorist activities. Salameh posits that the jury would have recognized Nosair's name, recalled that he was accused of terrorist acts, and imputed his terrorist activities to Salameh. This is sheer fantasy.
 
 
 127
 2. Admission of Abouhalima's Contacts with Nosair
 
 
 128
 Abouhalima contends that Judge Duffy erroneously admitted a visitor's log indicating that Abouhalima visited Nosair in prison. Abouhalima appears to claim that the visitor's log was unfairly prejudicial and possessed no probative value. Abouhalima's argument is contradicted by the record.
 
 
 129
 At trial, the government introduced phone records which showed that Abouhalima and his co-conspirators used Abouhalima's calling card to contact each other and to order various chemicals and explosives. Abouhalima maintained that his calling card had been stolen and that an unauthorized user made the calls. In support of this claim, Abouhalima pointed out that he twice notified the phone company that his card was being fraudulently used, first on February 8, 1993, and again on the day of the bombing, February 26, 1993.
 
 
 130
 To rebut Abouhalima's claim that he lost the calling card, the government introduced evidence that a call was made with Abouhalima's calling card on February 7, 1993, from the Attica Correctional Facility's Visitor's Center. The government also introduced the visitor's log from the Attica Visitor's Center, which showed that Abouhalima visited Nosair on February 7, 1993. Abouhalima was Nosair's sole visitor that day.
 
 
 131
 The visitor's log was properly admitted. It tended to disprove Abouhalima's claim that his calling card was stolen. See Fed.R.Evid. 401 (evidence is relevant if it makes any fact of consequence less probable). The probative value of this evidence easily outweighed any possible unfair prejudice. See Fed.R.Evid. 403. This is especially true when it is recalled that Nosair was never identified as a terrorist.
 
 C. Admission of Identification
 
 132
 Both Salameh and Abouhalima challenge the admission of pretrial and in-court identification evidence after a witness incorrectly identified two jurors as Salameh and Abouhalima. Specifically, Salameh and Abouhalima contend that it was improper to allow the government to introduce the bewildered witness's pretrial identification of Salameh and Abouhalima and his subsequent, accurate in-court identification. This is one of the more compelling arguments.
 
 
 133
 On the morning of the bombing, Willie Hernandez Moosh was working as a gas station attendant in Jersey City. At trial, Moosh testified through a Spanish interpreter. He said that between 3:00 and 4:00 a.m., on February 26, 1993, a yellow Ryder van and a navy blue Lincoln Continental entered Moosh's gas station together. Moosh described the passenger of the Ryder van as having a "horse face" and black hair, and the driver of the Lincoln as a husky, white man with orange colored hair, freckles and a light beard. Moosh said that the two men told him to fill up their vehicles with gas.
 
 
 134
 Moosh stated that, after he filled up the tanks, the driver of the Lincoln paid for both vehicles. Moosh recounted that the two vehicles began to drive away but stopped when a police car happened to drive by the station. At that point, the passenger of the Ryder van got out, raised the hood of the van and asked Moosh for some water. Moosh fetched the water, but he remembered that the water was never used.
 
 
 135
 At trial, Moosh identified a photograph of Yousef as the "horse face" passenger in the Ryder van. The government then asked Moosh if he saw the driver of the Lincoln in the courtroom, and Moosh stepped down from the witness stand, pointed at the jury box to one of the jurors, and said, "[i]t was a person such as this one." After Moosh returned to the stand, the government asked him if he saw the driver of the Ryder van in the courtroom. Again, Moosh left the witness stand, pointed to another juror, and said, "[a] person such as this one."
 
 
 136
 At sidebar, the government stated its intention to rehabilitate the witness by presenting evidence of Moosh's prior identification of Salameh and Abouhalima from photo arrays shown to him by the FBI shortly after the bombing. Defense counsel objected, but--significantly--did not request a hearing to determine whether the prior identification of the photo arrays was unduly suggestive. Judge Duffy admitted the photo arrays under Federal Rule of Evidence 801(d)(1)(C). Salameh's counsel preferred that all the arrays shown to Moosh be admitted, not just the two from which Moosh had identified Salameh and Abouhalima. All the arrays were then admitted.
 
 
 137
 When Moosh earlier identified the defendants from the photo arrays, he signed statements affirming that the men he selected in the arrays were the men he saw at the gas station on the morning of the bombing. Before the arrays were admitted into evidence, the government attached these statements to each of the two arrays containing the photographs of Salameh and Abouhalima. No objection was made.
 
 
 138
 Moosh testified that approximately one week after the bombing of the World Trade Center, he saw a picture of Salameh in a newspaper and recognized him as one of the men who bought gas on the morning of the bombing. Moosh then recounted his meeting with the FBI, during which he identified the driver and passenger of the Ryder van, and the driver of the Lincoln, from the photo arrays. The government then showed Moosh the photo arrays, including those containing photos of Salameh and Abouhalima. Moosh identified the exhibits as the arrays he had reviewed and confirmed that the statements attached to those arrays bore his signature.
 
 
 139
 At that point, trial was adjourned for the day. After the jury was excused and Moosh left the witness stand, Moosh pointed out Abouhalima to his interpreter and said, "that Rubio [meaning, in Spanish, a blond or red-haired person] in the corner ... that is him." The interpreter related Moosh's statement to Judge Duffy and the government. The next morning, the government informed Judge Duffy and defense counsel that, when cross-examination was completed, it planned on redirect to elicit Moosh's observations about "Rubio."
 
 
 140
 On cross-examination by Salameh's counsel, Moosh testified that he might have been incorrect the day before when he identified the juror as the driver of the Ryder van. Moosh said that the driver actually looked more like the defendant Salameh. Moosh walked over to Salameh, stood next to him, and said, "Yes, it's him.... He was this gentleman who came. Yes, because now I can see him closer up and I can concentrate more."
 
 
 141
 On redirect examination by the government, Moosh explained that he recognized Abouhalima in court on the prior evening. On recross, Moosh explained that he had not looked around the room carefully the day before and he recognized Abouhalima for the first time as he was leaving the stand.
 
 
 142
 On appeal, Salameh and Abouhalima stress that the trial judge committed reversible error by admitting the photo arrays and Moosh's subsequent in-court identifications. First, Salameh and Abouhalima claim that the photo array was unduly suggestive and used improperly to refresh Moosh's recollection. Second, Salameh and Abouhalima contend that because Judge Duffy improperly allowed the government "to prompt the witness to change his identification," the in-court identifications of Salameh and Abouhalima were tainted and prejudicial.
 
 
 143
 We review a district court's decision to admit identification evidence for clear error. Jakobetz, 955 F.2d at 803.
 
 1. Use of Photo Array
 
 144
 A prior identification is admissible under Fed.R.Evid. 801(d)(1)(C), regardless of whether the witness confirms the identification in-court. See United States v. Simmons, 923 F.2d 934, 950 (2d Cir.1991); United States v. Lewis, 565 F.2d 1248, 1251-52 (2d Cir.1977). A prior identification will be excluded only if the procedure that produced the identification is "so unnecessarily suggestive and conducive to irreparable mistaken identification that [the defendant] was denied due process of law." Simmons, 923 F.2d at 950 (internal quotation marks and citation omitted; alteration in original). A district court's decision to admit a prior identification is entitled to deference and will not be disturbed absent clear error. See Jakobetz, 955 F.2d at 803.
 
 
 145
 The district court did not abuse its discretion by admitting the photo array as evidence of a prior identification. As an initial, but important, matter, defendants waived their right to challenge the prior identification. The government provided the defendants with the photo arrays before trial and advised them that the arrays were used by the FBI to elicit identifications of the defendants. However, no defendant sought to suppress the arrays. See Fed.R.Crim.P. 12(b)(3) (motion to suppress "must be raised prior to trial").
 
 
 146
 Moreover, neither Salameh nor Abouhalima requested a Wade hearing pursuant to United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), to assess whether the photo arrays were unduly suggestive. Therefore, that claim was waived. See Fed.R.Crim.P. 12(f) ("Failure by a party to raise defenses or objections ... which must be made prior to trial ... shall constitute waiver thereof."); United States v. Gomez-Benabe, 985 F.2d 607, 611 (1st Cir.1993).
 
 
 147
 Finally, putting aside the waiver issue, Salameh and Abouhalima have failed to demonstrate that the photo arrays were unduly suggestive. Each array consisted of six black and white photographs depicting men very similar in appearance to each other. None of the arrays met the standard for suppression on the ground of suggestiveness. See United States v. Gibson, 135 F.3d 257, 260 (2d Cir.1998) (per curiam); United States v. Bautista, 23 F.3d 726, 731 (2d Cir.1994).
 
 
 148
 Salameh and Abouhalima now cavil that it was improper to attach Moosh's written statements to two of the photo arrays. First, no defendant objected to this evidence. Second, they have not shown that the attachment of the prior statements, viewed in the totality of the circumstances, was "conducive to irreparable mistaken identification." Simmons, 923 F.2d at 950 ("[E]ven a suggestive out-of-court identification will be admissible if, when viewed in the totality of the circumstances, it possesses sufficient indicia of reliability.").
 
 2. Subsequent In-Court Identifications
 
 149
 The trial court did not err by admitting Moosh's subsequent in-court identifications of Salameh and Abouhalima.
 
 
 150
 A witness who identified a defendant prior to trial may make an in-court identification of the defendant if: (1) the procedures giving rise to the pretrial identification were not unduly suggestive; or (2) the in-court identification is independently reliable, even though the pretrial identification was unduly suggestive. See, e.g., United States v. Wong, 40 F.3d 1347, 1359 (2d Cir.1994) (citing Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir.1986)). The reliability of an in-court identification is determined by "weighing the degree of suggestiveness of [the pretrial procedures] against 'factors suggesting that [the] in-court identification may be independently reliable rather than the product of the earlier suggestive procedures.' " United States v. Ciak, 102 F.3d 38, 42 (2d Cir.1996) (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 973 (2d Cir.1990) (citations omitted; second alteration in original)). Factors suggesting reliability include: the witness's opportunity to view the defendant during the crime; the witness's degree of attention; the accuracy of the witness's pre-identification description of the defendant; the level of certainty demonstrated at the identification; and the time between the crime and the identification. Manson, 432 U.S. at 114, 97 S.Ct. 2243.
 
 
 151
 Although the government cannot properly endeavor "to manufacture an identification" where none existed, it may use a photo array to attempt to refresh a witness's recollection. Maldonado-Rivera, 922 F.2d at 975-76. Such a procedure is appropriate "provided there is a foundation for believing that the witness once had knowledge of the fact as to which his recollection is to be refreshed." Id. at 976.
 
 
 152
 As discussed above, Salameh and Abouhalima failed to demonstrate that Moosh's prior identification was based on unduly suggestive procedures. Accordingly, any question regarding the reliability of Moosh's identifications goes only to the weight of the evidence, not its admissibility.
 
 
 153
 Even assuming, arguendo, that the photo arrays were unduly suggestive, the in-court identification was admissible because it was independently reliable. Moosh testified that he had seen and spoken with Salameh and Abouhalima when he pumped gas for them on the fateful morning. He independently recognized Salameh's photograph in the newspaper and accurately described both Salameh and Abouhalima to the FBI. There is no suggestion that Moosh was equivocal during his FBI interview, including when he identified Salameh and Abouhalima from the photo arrays. Furthermore, the pretrial identification occurred shortly after the bombing. See id.
 
 
 154
 Moreover, the jury witnessed the botched, and subsequently corrected, in-court identification. The jurors could determine for themselves the credibility of Moosh's subsequent identification based on this evidence.
 
 D. Examination of Storage Facility Employee
 
 155
 Abouhalima contends that he was deprived of a fair trial when the government was allowed to use leading questions during direct examination of Blessing Igiri, and later when the court interfered during Salameh's cross-examination of Igiri. We disagree.
 
 
 156
 Igiri worked at the Space Station. On direct examination, he testified that Salameh, whom Igiri knew as "Kamal Ibraham," had rented the Shed. Igiri added that, on the day before the bombing, he spoke with Salameh and another man at the Space Station while they were waiting for a delivery. Igiri related that a truck loaded with gas cylinders pulled into the facility and that Salameh and the other man attended to the delivery.
 
 
 157
 After discussing the delivery, Igiri said that he could not recall what happened next. The government then asked Igiri: "Now, sir, did there come a time when you saw another vehicle approach the gate?" Salameh's objection that the question was leading was overruled. Igiri answered "no," he had not seen another vehicle. The trial then was adjourned for lunch.
 
 
 158
 When trial resumed, Igiri testified that, after the gas cylinder truck had departed, he had, in fact, observed Salameh and the other man enter the Space Station in a yellow Ryder van.
 
 
 159
 On cross-examination, Salameh's counsel pursued his quarry. He asked Igiri whether he had spoken to the government during the lunch recess. Igiri said no. However, in a sidebar requested by Salameh's counsel, the government commendably acknowledged that it had spoken with Igiri during the recess. At the request of Salameh's counsel, Judge Duffy asked Igiri in open court whether he had indeed spoken with the government during the recess. Igiri reiterated his denial. Judge Duffy then asked counsel for the government, in front of the jury, whether he met with Igiri. Counsel for the government confirmed that he had.
 
 
 160
 Judge Duffy instructed Igiri that "[l]awyers are supposed to talk to witnesses before they arrive here because if they don't know what the witnesses are going to testify to, God knows what we would be listening to. It is required. If they sit down and talk to you, there is nothing wrong with that at all. All right?" No defendant objected to Judge Duffy's questioning of, or comment to, Igiri. Upon further cross-examination, Igiri admitted meeting with the government during the recess and answered questions about the meeting. Abouhalima and Salameh now put forward that Judge Duffy committed reversible error by: (1) allowing the government to ask leading questions; and (2) his comments on Igiri's lunch-time meeting with the government.
 
 1. Leading Questions
 
 161
 The government notes that Abouhalima failed to raise his objections below and appellate review of these claims therefore is barred absent plain error. See United States v. Olano, 507 U.S. 725, 735-36, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). The government forgets, however, that Judge Duffy had earlier established a ground rule that an objection by one defendant would preserve the claims of all defendants. Therefore, when Salameh's counsel objected to the leading question put to Igiri, that objection was deemed raised by Abouhalima, as well. Accordingly, we review the district court's decision to allow the government to lead the witness Igiri for an abuse of discretion. See United States v. Ajmal, 67 F.3d 12, 16 (2d Cir.1995).
 
 
 162
 The trial court did not abuse its discretion by allowing the government to ask Igiri whether he "saw another vehicle approach the gate." Although leading questions generally should not be used on direct examination, a district judge may allow them "as may be necessary to develop the witness' testimony." Fed.R.Evid. 611(c). The challenged question was necessary to develop Igiri's testimony and elicit information from a nervous witness. See id.
 
 2. Comments Regarding Meeting
 
 163
 Abouhalima also claims that Judge Duffy's questions and comments during Igiri's cross-examination were improper and demonstrated bias in favor of the government. Because no defendant objected to Judge Duffy's questions and comments, this claim is barred absent plain error. See Olano, 507 U.S. at 735, 113 S.Ct. 1770. However, even if there were a proper objection, Abouhalima's claim would lack merit because the court properly exercised its discretion.
 
 
 164
 Reversal for judicial bias is appropriate only where an examination of the entire record demonstrates that "the jurors have been impressed with the trial judge's partiality to one side to the point that this became a factor in the determination of the jury." United States v. Valenti, 60 F.3d 941, 946 (2d Cir.1995) (internal quotation marks and citation omitted). The trial court's questioning did not demonstrate bias because Salameh's counsel specifically asked Judge Duffy to question Igiri to facilitate cross-examination. The judge simply complied with this request.
 
 
 165
 Furthermore, although Abouhalima claims that the court's comments "neutraliz[ed] the witness Igiri's lie about his mid-testimony meeting with the prosecutor," this claim is not supported by the record. Abouhalima asserts that Judge Duffy's comments to Igiri condoned the lie that Igiri told about meeting with the government. To the contrary, Judge Duffy simply explained to Igiri that it is not improper for a prosecutor to meet with a government witness regarding the witness's testimony. This comment cannot be construed as a condonation of Igiri's lie. The jury heard Igiri's lie and subsequent recantation and could be relied upon to factor this episode into its verdict.
 
 
 166
 E. Testimony of the Government's Fingerprint Expert
 
 
 167
 Ajaj argues that the trial judge erred by admitting the testimony of a fingerprint expert who opined that Ajaj held a notebook in a manner consistent with his having written in the notebook.
 
 
 168
 At trial, the government called Carol Edelen, an FBI fingerprint expert. The defendants did not contest Edelen's expertise in analyzing fingerprint evidence. Edelen testified that she identified hundreds of Ajaj's fingerprints on the terrorist materials that were taken from him when he entered the United States. For one particular object, a hand-written notebook which contained instructions on how to build explosives, Edelen explained to the jury how Ajaj's fingers were positioned in order to leave the prints that she identified. There was no objection to this testimony.
 
 
 169
 The government then asked Edelen whether she reached "any additional conclusions beyond the mere identification of those prints." Ajaj's counsel objected, arguing that although Edelen was an expert on fingerprint identification, "I don't know that she's been established as an expert on holding things." The court sensibly allowed Ajaj's counsel to voir dire Edelen on her ability to tell how a person was holding an object by analyzing fingerprint evidence. After listening to the voir dire, Judge Duffy permitted the government to ask Edelen whether she was able to come to any conclusions based upon the location of Ajaj's prints on the notebook.
 
 
 170
 Edelen explained that the position of the fingerprints suggested that Ajaj was holding the left side of the notebook in his left hand. She expressed no further opinion about the significance of the fingerprints or their positioning on the notebook. In summation, the government claimed that Ajaj, who is right-handed, was the author of the notebook because the author held the notebook in a manner consistent with how a right-handed person would hold a notebook while writing.
 
 
 171
 Ajaj argues that this testimony should not have been admitted. He argues that: (1) the subject of Edelen's testimony was not "scientific knowledge" and thus was not admissible under Federal Rule of Evidence 702; and (2) even if the testimony was "scientific knowledge," Edelen was not qualified to give such testimony. Neither of Ajaj's arguments has merit.
 
 
 172
 Generally, the admission of expert testimony is appropriate if "scientific, technical, or other specialized knowledge will assist the trier of fact." Fed.R.Evid. 702. We have held that expert testimony is proper under Rule 702 if it illuminates matters "not within the common knowledge of the average juror." United States v. Duncan, 42 F.3d 97, 102 n. 3 (2d Cir.1994).
 
 
 173
 When scientific evidence is proffered, the district court must ensure that it "rests on a reliable foundation and is relevant to the task at hand," before allowing it to be presented to the jury. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). A district court's decision to admit scientific evidence, like its decision to admit any other type of evidence, is reviewed under an abuse of discretion standard. See General Elec. Co. v. Joiner, 522 U.S. 136, ----, 118 S.Ct. 512, 517, 139 L.Ed.2d 508 (1997). A decision to admit scientific evidence is not an abuse of discretion unless it is "manifestly erroneous." McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1042 (2d Cir.1995).
 
 
 174
 Ajaj argues that identification of the placement of fingerprints is not based on any accepted scientific theory or principle. Thus, Ajaj maintains that although the identification of fingerprints rests on a reliable scientific foundation, an opinion on how particular fingerprints were made does not. His argument is wide of the mark.
 
 
 175
 Edelen explained that, given her expertise in identifying fingerprints, she "could determine in what position your hand was placed because [she] can determine what the top of the fingerprint is, or the side of the fingerprint is, so [she] can tell the position that you would be holding [for example, a pad of paper]." Indeed, Ajaj did not object to Edelen's lengthy exposition on the way his fingers were positioned on the notebook when they left the prints Edelen identified.
 
 
 176
 The voir dire made clear that Edelen's testimony regarding the placement of Ajaj's hand on the notebook was based on the same well-accepted scientific foundation as her identification of his fingerprints. Edelen explained that when a finger touches an object, the ridges of that finger leave an identifiable mark upon the object, which is referred to as a latent print. By comparing the ridges of a latent print to a sample print, a fingerprint expert can tell which finger left the latent print. A fingerprint expert can also tell whether a particular part of a finger left a latent print by comparing the ridges on that part of the finger with those on the object. By determining what part of a finger left a given print, a fingerprint expert can then determine the position of the finger when it left that print. Finally, by putting together the position of all the fingers, an expert can tell how a person was holding an object.
 
 
 177
 Judge Duffy correctly concluded that Edelen's opinion on the way that Ajaj held the notebook was based on a reliable scientific foundation.
 
 
 178
 Ajaj's claim that Edelen was unqualified to give the testimony regarding the way he was holding the notebook is also frivolous. Edelen was qualified to give expert testimony on how fingerprints are made, and how a person was holding an object when a print was made. See McCullock, 61 F.3d at 1044; Locascio, 6 F.3d at 937.
 
 F. Admission of DNA Evidence
 
 179
 Shortly after the World Trade Center bombing, a letter claiming responsibility for the attack was sent to the New York Times. At trial, the government introduced DNA evidence that suggested that Ayyad's saliva was used to seal the envelope containing the letter. On appeal, Ayyad argues that the court should have excluded the DNA evidence because the government failed to disclose the report of its DNA expert in a timely manner. We reject this argument.
 
 
 180
 At a pretrial conference held on April 1, 1993, one month after the bombing, Judge Duffy set a target date of July 6, 1993, for the government's disclosure of expert reports. Although Ayyad implies that Judge Duffy "ordered" discovery to be completed by July 6, he issued no such order. Rather, in estimating a trial date, Judge Duffy stated that "[i]f you get everything done and the reports issued by the 6th of July," a trial date of September 14 was "feasible." Full disclosure by July 6, appears to have been a goal, not a mandate.
 
 
 181
 On June 28, 1993, the government turned over a report by the FBI laboratory containing a DNA analysis of the saliva on the envelope. The June 28 report did not identify potential sources of the saliva. On July 14, 1993, the government disclosed an additional report, dated July 13, 1993, which opined that Ayyad was a potential source of the saliva. Ayyad did not protest the timing of this disclosure or request an adjournment of the trial. Opening statements in the trial began on October 4, 1993.
 
 
 182
 The government is required to disclose to a defendant results or reports of scientific tests that are material to the defense and are known, or could be discovered through due diligence, by the government. See Fed.R.Crim.P. 16(a)(1)(D). A district court has broad discretion in fashioning a remedy for the government's violation of its obligations under Rule 16(a), including ordering the exclusion of evidence. See United States v. Thai, 29 F.3d 785, 804 (2d Cir.1994). A district court's decision not to exclude evidence that was the subject of a Rule 16(a) violation is not grounds for reversal unless the violation caused the defendant "substantial prejudice." See, e.g., United States v. Adeniji, 31 F.3d 58, 64 (2d Cir.1994). "Substantial prejudice" means "the prejudice resulting from the government's untimely disclosure of evidence, rather than the prejudice attributable to the evidence itself." United States v. Sanchez, 912 F.2d 18, 23 (2d Cir.1990).
 
 
 183
 The government's disclosure of the July 13 report on July 14 was not a violation of Rule 16(a). The government disclosed the report one day after it was issued and almost three months before the start of the trial. Ayyad argues that the disclosure ran afoul of Rule 16(a) because it violated Judge Duffy's "order" that all expert reports be disclosed by July 6. However, as explained above, no such order was issued. Indeed, it is telling that Ayyad did not object to the expert report in the district court on the ground that it was produced in violation of Rule 16(a).
 
 
 184
 Even assuming that the July 14 disclosure of the expert report violated Rule 16(a), Ayyad fails to demonstrate "substantial prejudice" arising from the late disclosure. The report was disclosed just one week after the discovery target date and almost three months before the start of trial. Thus, Ayyad's counsel had ample time to analyze the report and to construct a defense to its contents. Judge Duffy's failure to suppress therefore is not grounds for reversal. See United States v. Matthews, 20 F.3d 538, 550 (2d Cir.1994).
 
 
 185
 Ayyad also makes an unsubstantiated claim that the government wrongfully withheld certain documents relevant to the DNA evidence until just before its DNA expert's testimony. Ayyad argues that although the government turned over these documents immediately before the expert's testimony pursuant to 18 U.S.C. § 3500, disclosure should have been made earlier under Rule 16(a). However, Ayyad did not identify a single document which the government improperly disclosed as § 3500 material. The record does not suggest that any such documents exist. Thus, we conclude that Ayyad's conclusory claim is without merit.
 
 G. Confrontation Clause
 
 186
 Abouhalima contends that the trial judge violated his Sixth Amendment right to confront adverse witnesses by excluding evidence that allegedly impeached the credibility of three government witnesses--Ashraf Moneeb, Carl Butler and Wahed Moharam. Ajaj also argues that Judge Duffy improperly limited cross-examination of these witnesses.
 
 
 187
 The Confrontation Clause of the Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. Amend. VI; see Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). While the Sixth Amendment guarantees the right to cross-examine witnesses at trial, the scope and extent of cross-examination are committed to the sound discretion of the trial judge. See United States v. Scotti, 47 F.3d 1237, 1248 (2d Cir.1995). "So long as the jury has before it sufficient information to make a discriminating appraisal of the witness's possible motives for testifying falsely in favor of the government, we will uphold the trial court's exercise of its discretion." Id. (quoting United States v. Concepcion, 983 F.2d 369, 391-92 (2d Cir.1992)). Furthermore, the trial judge has "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1431.
 
 1. Moneeb
 
 188
 Moneeb testified that he lived with Salameh and Yousef in Jersey City during the fall of 1992, and saw Abouhalima visit Salameh and Yousef on several occasions. Abouhalima argues that Judge Duffy precluded cross-examination of Moneeb on the circumstances of his questioning by the FBI; specifically that Moneeb was in fear, handcuffed and held at gunpoint during the questioning, and that the FBI threatened to deport Moneeb if he refused to answer their questions.
 
 
 189
 Although Judge Duffy limited Abouhalima's attempts to elicit the specific circumstances of the FBI's questioning of Moneeb, the limitations were not an abuse of discretion. See Scotti, 47 F.3d at 1248. In fact, Judge Duffy overruled several government objections, and permitted Abouhalima to elicit that: (1) Moneeb was nervous about testifying and afraid of the FBI agents; (2) the agents pointed a gun at Moneeb and handcuffed him before transporting him to their office for questioning; and (3) the agents questioned Moneeb about his pending citizenship application and confiscated his green card. Judge Duffy also permitted defense counsel to question Moneeb specifically about the "pressure" he felt as a result of his contact with the FBI. Accordingly, the jury was given sufficient information to make a discriminating evaluation of Moneeb's credibility and possible motives for testifying falsely in favor of the government. See id.
 
 2. Butler
 
 190
 Before Butler testified, Judge Duffy reviewed, in camera, prison records relating to a sentence Butler served between 1956 and 1967 for robbery, assault and sodomy. Evidence arguably suggested that Butler tried to conceal three prior misdemeanor convictions for disorderly conduct at his 1956 sentencing proceeding. Judge Duffy ruled that the evidence suggesting that Butler may have lied at his 1956 sentencing would not be disclosed to the defense. Immediately thereafter, in a conference attended by defense counsel, Judge Duffy granted the government's motion to preclude entirely any cross-examination of Butler regarding his criminal record. In addition to the 1956 felony conviction, Butler's criminal record included various misdemeanor arrests, the most recent of which resulted in a misdemeanor conviction for assault in 1976.
 
 
 191
 Judge Duffy's rulings were not an abuse of discretion, particularly considering that more than 25 years had elapsed since Butler had completed the sentence on his felony conviction. Federal Rule of Evidence 609(b) bars evidence of a conviction if more than ten years have elapsed since a witness was released from the resulting confinement, unless "the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." Fed.R.Evid. 609(b).
 
 
 192
 Judge Duffy properly found that the evidence regarding Butler's 1956 sentencing lacked sufficient probative value. Butler's misdemeanor arrests and convictions were more than fifteen years old, and they were not admissible under Rule 608(b) because they did not involve dishonesty or a false statement, and so were not "probative of truthfulness or untruthfulness." Fed.R.Evid. 608(b).
 
 3. Moharam
 
 193
 Moharam was a paid government informant who provided information regarding one of Abouhalima's co-conspirators, Sheik Omar Abdel Rahman. Abouhalima argues that his constitutional rights were violated when Judge Duffy, during an ex parte conference, ruled that the government could withhold from the defense "the terms of [Moharam's] deal" with the government.
 
 
 194
 Before Moharam testified, the government informed Judge Duffy, ex parte, that between June 1991 and July 1992 Moharam was paid $550 for information about Abdel Rahman. The government requested that it be permitted not to disclose Moharam's role as an informant, based on concerns for the safety of Moharam and his family, the relatively small sum involved and the abundance of impeachment material already provided to the defendants.
 
 
 195
 Judge Duffy ordered the government to disclose that Moharam was an informant and that he had received $550 cash and various other financial support for information, but not that Moharam had provided information specifically about Abdel Rahman. Judge Duffy precluded disclosure of the connection to Abdel Rahman because of concerns about the damaging effect on the defendants if evidence about Abdel Rahman--who was charged in another highly publicized criminal case with, among other things, seditious conspiracy to wage a war of urban terrorism against the United States--was injected into this trial. Accordingly, it was a sound exercise of discretion to suppress at trial that it was Abdel Rahman about whom Moharam had provided the government with information.
 
 
 196
 Furthermore, Abouhalima's claim that Judge Duffy "stifled exploration" of Moharam's financial interest in the case is misguided because Judge Duffy allowed extensive cross-examination regarding Moharam's status as a paid informant. Abouhalima cross-examined Moharam concerning many aspects of Moharam's financial relationship with the government and Abouhalima was able to exploit skillfully in summation the potential financial interest Moharam might have had in this case.
 
 
 197
 Abouhalima also maintains that he was wrongfully prejudiced because Judge Duffy did not require the government to disclose Moharam's "penal interest" in the case, or the reason why Moharam decided to cooperate with the government. Abouhalima's counsel suggested to the judge during a pretrial conference that Moharam had been arrested in 1991 for illegal activity and that his co-operation with the government was motivated by his arrest. This allegation was unsupported; indeed the government maintained it was untrue. There is nothing in the record to show that the reason Moharam decided to cooperate with the government was relevant to the case now before us or should have been disclosed to the defense. Therefore, Judge Duffy did not err when he determined that the details of Moharam's agreement with the FBI and the subject matter of his informant work, with the exception of his financial interest, need not be disclosed. Furthermore, the court's decision did not impinge on Abouhalima's confrontation rights because Abouhalima conducted an extensive cross-examination and attacked Moharam's credibility from many angles. The trial court acted within its sound discretion. See Scotti, 47 F.3d at 1248.
 
 H. Requested Read-back of Testimony
 
 198
 Abouhalima argues that the court denied him a fair trial by improperly responding to a jury note requesting the read-back of certain testimony.
 
 
 199
 Abouhalima complains that Judge Duffy improperly declined to read certain portions of the testimony of Michael Felton, Carl Butler and Ashraf Moneeb. Although Judge Duffy did read back certain testimony in response to the jury's requests, Abouhalima argues that he failed to include important testimony in the read-backs. This argument fails because the portions of testimony that Abouhalima points to were not responsive to the jury's read-back requests.
 
 
 200
 A trial court's refusal to allow read-backs of testimony in response to jury requests during deliberations is within its broad discretion. See, e.g., United States v. Criollo, 962 F.2d 241, 243 (2d Cir.1992) (citing United States v. McElroy, 910 F.2d 1016, 1026 (2d Cir.1990)). Judge Duffy did not abuse his discretion.
 
 
 201
 First, the jury's note requested a read-back of Felton's testimony concerning "[i]dentification of A, tenants[,] and B, visitors to 40 Pamrapo." Abouhalima argues that Judge Duffy should have read to the jury Felton's testimony that: (1) Felton was never in the apartment when "the big guy" was there; (2) a second-floor tenant at 40 Pamrapo owned the Lincoln automobile pictured in a photograph of the building; (3) Felton did not see Salameh move out of the apartment; and (4) Felton was interviewed repeatedly by the FBI and the news media.
 
 
 202
 None of the requested testimony was responsive to the jury's note because none of this testimony involved the identification of Pamrapo tenants and visitors. Thus, Judge Duffy properly refused to read it.
 
 
 203
 Second, the jury asked to hear Butler's testimony relating to the "[i]dentification of visitors to 40 Pamrapo." Abouhalima claims that the court should have read Butler's testimony that only one tenant lived in the Pamrapo apartment and that Butler was unable to describe the drivers of various cars he saw at Pamrapo. This testimony was not responsive to the jury's request about the identification of visitors and was properly excluded.
 
 
 204
 Finally, the jury's note requested a read-back of Moneeb's testimony concerning the "[i]dentification of visitors to roommates at [the] shared apartment." Moneeb's roommates were Salameh and Yousef. Abouhalima maintains that Judge Duffy should have read Moneeb's testimony that: (1) Moneeb lived and studied in the living room and, therefore, Salameh's visitors closed the bedroom door out of courtesy and not necessarily for privacy; (2) Moneeb was nervous during his testimony and also when the FBI interviewed him; (3) the FBI, when interviewing Moneeb, kept him in handcuffs and held a gun to his head; (4) the FBI had taken Moneeb's green card and refused to return it until after his testimony; and (5) Moneeb's citizenship had been delayed since the FBI started questioning him about this case. Once again, Judge Duffy's read-back was proper because the additional testimony was not responsive.
 
 V.
 JURY ARGUMENTS
 
 205
 Abouhalima argues that the government, through its opening statements and summation, deprived him of a fair trial by egregiously misrepresenting the evidence, by appealing to the jurors' fears, by vouching for a witness, and by attempting to shift the burden of proof. Ajaj argues that the government misrepresented the evidence, invited the jury to speculate and relied on evidence it knew, or should have known, was false.
 
 
 206
 "Due process bars a prosecutor from making knowing use of false evidence." United States v. Boothe, 994 F.2d 63, 68 (2d Cir.1993). "[A] conviction may not stand if such evidence could in any reasonable likelihood have affected the judgment of the jury." Id. (citations, internal quotation marks and alterations omitted). Moreover, although the government has "broad latitude in the inferences it may reasonably suggest to the jury during summation," United States v. Zackson, 12 F.3d 1178, 1183 (2d Cir.1993) (citation and internal quotation marks omitted), "[t]he prosecutor has a special duty not to mislead; the government should ... never make affirmative statements contrary to what it knows to be the truth." United States v. Myerson, 18 F.3d 153, 162 n. 10 (2d Cir.1994) (citation and internal quotation marks omitted; first alteration in original); see United States v. Valentine, 820 F.2d 565, 570 (2d Cir.1987). "A prosecutor's statements during summation, if improper, will result in a denial of due process rights only if, in the context of the entire summation, they cause the defendant substantial prejudice." United States v. Rivera, 22 F.3d 430, 437 (2d Cir.1994). To determine whether substantial prejudice was caused, we consider "the severity of the misconduct, the curative measures taken by the court, and the certainty of conviction absent the misconduct." Id. Where the defendant fails to object to the prosecutor's purported misrepresentations at trial, we review the government's summation for flagrant abuse. See id. For the reasons that follow, we reject Abouhalima's and Ajaj's contentions.
 
 
 207
 A. Prosecutorial Misconduct as to Abouhalima
 
 1. Government Misrepresentations
 
 208
 Abouhalima submits that the government argued during summation, without any evidentiary support that (a) witnesses had identified him at the 40 Pamrapo apartment and had seen him carrying buckets of chemicals out of that apartment; (b) he had admitted his affiliation with Yousef shortly after he was taken into United States custody; and (c) he gave no explanation for his nervousness the night after the bombing.
 
 
 209
 a. Witnesses
 
 
 210
 During summation the government argued to the jury that Abouhalima helped Yousef and Salameh make the World Trade Center bomb at 40 Pamrapo. In support of this argument, the government relied in part on the testimony of two witnesses, Michael Felton and Carl Butler. These witnesses testified that a man fitting Abouhalima's description and driving a Lincoln Town Car frequented the 40 Pamrapo address and, on one occasion, was "barking orders" at Salameh and another individual while they were removing buckets from the premises. Although Abouhalima is correct that neither witness actually identified him at trial as this particular person, the government acknowledged during summation that Felton and Butler had not identified Abouhalima and simply asked the jury to draw the reasonable inference that the person described was Abouhalima. Consequently, we perceive no impropriety in the argument, let alone prejudice.
 
 
 211
 b. Affiliation With Yousef
 
 
 212
 The government also did not improperly argue that Abouhalima had admitted his association with Yousef. The record reveals that shortly after Abouhalima was taken into custody, federal agents advised him that he was under arrest for "his participation in the World Trade Center bombing." After advising him of his constitutional rights, agents questioned him about the 40 Pamrapo apartment. In response to this questioning, Abouhalima asked the agents whether they "knew an individual by the name of 'Rashid.' " Because Yousef's nickname was "Rashed," it appeared that Abouhalima had linked Yousef to the 40 Pamrapo apartment and the government's argument simply made this point. Given the broad latitude afforded both sides during summation, there was no impropriety in the government's argument because the inference sought was reasonable and Abouhalima remained free to argue his own interpretation of the testimony. Moreover, because Abouhalima did not object to this argument at trial, he must show "flagrant abuse," which is simply not present here.
 
 
 213
 c. Inexplicable Nervousness
 
 
 214
 Finally, Abouhalima asserts that the government misrepresented the record by arguing that he gave no explanation for his nervousness the night after the bombing. We conclude that there was no misrepresentation. At trial, Moharam, a friend of Abouhalima, testified that Abouhalima was upset the night after the bombing and that when Moharam asked him why he was upset, Abouhalima initially said there had been an "accident" in which people got hurt. When Moharam then asked Abouhalima for details, Abouhalima replied, "I can't tell you," and said nothing more. Accordingly, the prosecutor's argument was well supported by the evidence.
 
 2. Jury Fear
 
 215
 Abouhalima argues that during both opening statements and summation, "the prosecutor sabotaged his right to a fair trial by appealing to the jury's fears and prejudicing them with the threat, based on no evidence, that they were charged with deciding guilt for the single most destructive act of terrorism ever committed here in the United States." We disagree.
 
 
 216
 Because the prosecutor's statement was amply supported by the evidence, we perceive no misconduct or prejudicial error. Specifically, the statement was supported by the letter the conspirators sent to the New York Times claiming responsibility, in which the conspirators identify their action as a "similar response" to "the terrorism that Israel practices." The statement was also supported by the violence-advocating terrorist literature seized from Abouhalima's apartment after the bombing, literature that echoed the sentiments expressed in the letter. Further, given the magnitude of the World Trade Center bombing, the heinous nature of all crimes charged in the indictment, and the overwhelming evidence of the conspirators' joint motive for committing the bombing, the government's brief references to terrorism and the severity of the bombing during opening statements and summation were consistent with the trial evidence and Abouhalima's right to a fair trial.
 
 3. Government Vouching
 
 217
 Abouhalima argues that during rebuttal summation, a prosecutor improperly "vouched" for a witness. Specifically, according to the trial record, Ashraf Moneeb (the roommate of Salameh and Yousef at 251 Virginia Avenue) testified that one Mohammad Abouhalima had assisted Yousef and Salameh relocate to the 40 Pamrapo apartment. Because Abouhalima's first name is Mahmoud and not Mohammad, and because Abouhalima's brother is named Mohammed, Abouhalima argued during summation that Moneeb had testified to certain assistance rendered by his brother and not him. On rebuttal summation, Abouhalima claims that the prosecutor, in an attempt to discredit Abouhalima's argument, told the jury that "he knew that the witness Moneeb meant to say that Mahmoud Abouhalima, and not his brother Mohammad, had helped Salameh and Yousef find the 40 Pamrapo apartment," and thus improperly vouched for Moneeb.
 
 
 218
 We find no support in the record for the proposition that the government engaged in vouching, and in any event conclude that the government's remarks did not deprive Abouhalima of a fair trial. "A prosecutor must scrupulously refrain from injecting his credibility into any part of the trial." United States v. Damsky, 740 F.2d 134, 138 n. 3 (2d Cir.1984). "The controlling question is whether the remarks of the prosecutor invaded the accused's right to a fair trial." United States v. Clark, 613 F.2d 391, 405 (2d Cir.1979).
 
 
 219
 A review of the argument and relevant testimony dispels the notion that the jury was asked to substitute the prosecutor's knowledge for the actual testimony. Specifically, in its main summation, the government reminded the jury that a witness, Ashraf Moneeb, testified that Yousef had told him that the appellant, "Mahmoud Abouhalima" had helped Yousef and Salameh find a new place to live. In Abouhalima's summation, Abouhalima pointed out that the transcript of Moneeb's testimony indicated that Yousef attributed that assistance to Abouhalima's brother, "Mohammad Abouhalima." During rebuttal summation, the government argued that although the trial transcript did read "Mohammad Abouhalima," the witness in fact had said "Mahmud Abouhalima" and the court reporter simply had made a mistake. As the prosecutor observed:
 
 
 220
 Obviously there was a mistake. If Mr. Moneeb had said Mohammad Abouhalima why would then [defendant Abouhalima's counsel] have [Moneeb] point out [the appellant] Mahmoud Abouhalima on his cross-examination which he did.
 
 
 221
 ....
 
 
 222
 I suggest to you that is a mistake and you know it is from all the other evidence.
 
 
 223
 The prosecutor then cataloged the array of proof confirming that Mahmoud Abouhalima (and not his brother Mohammad) had assisted Yousef and Salameh in obtaining the 40 Pamrapo apartment, evidence that included the balance of Moneeb's testimony and the voluminous telephone records linking Mahmoud Abouhalima with Salameh and Yousef just before the rental of the apartment. Further, the prosecutor noted that the telephone records reflected no calls to Mohammad Abouhalima. In sum, the record does not support Abouhalima's allegation of government vouching and, in any event, the prosecutor's remarks did not deprive Abouhalima of a fair trial.
 
 4. Burden of Proof
 
 224
 Abouhalima contends that the government unconstitutionally shifted the burden of proof by commenting on his failure to introduce evidence and that the district court failed to deliver on its promise to administer a curative instruction. Specifically, during summation the government discussed the plethora of evidence linking Abouhalima to the bomb-making activities at 40 Pamrapo. In the discussion, the government reminded the jury that sulfuric acid, a component of nitroglycerine, had been detected on Abouhalima's dress shoes. Thereafter the prosecutor, in anticipation of Abouhalima's rebuttal, reviewed the alternative explanations for the presence of sulfuric acid that had been proffered by the defense through the cross-examination of a government chemist, including the theory that a possible source for the sulfuric acid was car batteries. In this regard, the prosecutor then argued:
 
 
 225
 But, again, there is no proof anywhere, there is no evidence before you at all that Mahmoud Abouhalima was ever near, underneath the hood of his car, anywhere near his battery, let alone the acid from within the battery.
 
 
 226
 The proof that is before you, the evidence in this case that he's at a bomb factory every night on a virtual day by day basis. And in that bomb factory, they're using sulfuric acid. And sure enough, he has sulfuric acid on his shoe.
 
 
 227
 Shortly after these remarks, Abouhalima objected and asked Judge Duffy to instruct the jury that despite the prosecutor's statement, "the burden of proof is not on the defendant to prove that the stain on his shoe didn't come from some lawful means." Judge Duffy acquiesced, promising Abouhalima that he would "take care of that in the charge for sure."
 
 
 228
 On appeal, Abouhalima maintains that the prosecutor's argument had the effect of placing the burden of proof on him to come forward with exculpatory evidence indicating an innocent source for the sulfuric acid. Moreover, Abouhalima avers that because the government had introduced evidence that Abouhalima was a limousine driver and thus routinely worked around cars and car batteries, the government's argument was not justified. The government responds that the prosecutor merely commented on the implausibility of Abouhalima's theories by juxtaposing the complete absence of any evidence that Abouhalima was ever near battery acid against proof that Abouhalima did frequent a place where sulfuric acid was being used, i.e., a bomb factory. Moreover, the government also maintains that the district court did honor its promise to give a curative instruction during the jury charge.
 
 
 229
 We conclude that the prosecutor's remarks did not violate Abouhalima's constitutional rights. The government is free to comment on "the failure of defendant to refute government evidence or to support his own claims." Rosa, 11 F.3d at 342. "A constitutional violation occurs only if either the defendant alone has the information to contradict the government evidence referred to or the jury naturally and necessarily would interpret the summation as comment on the failure of the accused to testify." United States v. Coven, 662 F.2d 162, 171 (2d Cir.1981) (quoting United States v. Bubar, 567 F.2d 192, 199 (2d Cir.1977) (internal quotation marks omitted)).
 
 
 230
 In the present case, Abouhalima does not argue that only he had information capable of rebutting the government's theory as to the source for the sulfuric acid stain. To the contrary, Abouhalima points to car batteries as the source and concedes that the trial evidence indicated that as a limousine driver, he routinely worked around car batteries containing sulfuric acid. Moreover, because the prosecutor did not speak to Abouhalima's failure to testify, but merely sought to discredit the defense's hypothetical explanation, it is implausible that a jury would interpret the summation as comment on Abouhalima's failure to testify. Accordingly, Abouhalima's constitutional rights were not violated. Furthermore, to the extent that the prosecutor's comments may have confused which party carried the burden of proof, the district court adequately cured any misunderstanding by charging the jury, without objection, on the appropriate burden of proof standard, re-emphasizing that standard at the conclusion of the charge. Accordingly, we conclude that there was no constitutional violation, misconduct, or prejudice requiring reversal, regardless of the district court's earlier promises.
 
 B. Prosecutorial Misconduct as to Ajaj
 1. Government's Improper Arguments
 
 231
 Ajaj argues that the government's summation misrepresented the evidence, invited the jury to speculate, and was based on evidence the government knew or should have known to be false.[5] Specifically, Ajaj assails the government's argument that Ajaj facilitated Yousef's entry into the United States at Kennedy Airport. According to Ajaj, no testimony at trial established that Ajaj created a distraction or in any way affected the INS's processing of Yousef at Kennedy Airport.
 
 
 232
 Ajaj also argues that the government knowingly used false evidence of stamps on Ajaj's Jordanian passport to show that Ajaj traveled to the Middle East to obtain terrorist training. The passport, issued to Ajaj in August 1991, bore stamps indicating that Ajaj: (1) on May 16, 1992, left Pakistan and entered the United Arab Emirates; (2) traveled to Saudi Arabia later that month; (3) on June 13, 1992, exited the United Arab Emirates; and (4) on June 14, 1992, returned to Pakistan. The date of Ajaj's re-entry into Pakistan was corroborated by Ajaj's Pakistani Certificate of Registration, which also was dated June 14, 1992. At trial, the government alleged that Ajaj made the brief trip to Saudi Arabia in order to obtain a letter of introduction to Camp Khaldan, a terrorist training camp located on the AfghanistanPakistan border. The letter of introduction, dated May 21, 1992, requested that the leader of Camp Khaldan provide the bearer with training in the use of weapons and explosives.
 
 
 233
 Ajaj argues that the passport contained fraudulent stamps and was therefore an unreliable travel document. He contends that the government deliberately mistranslated or failed to translate several passport stamps in an effort to conceal their inauthenticity. For example, the government translated a Kuwaiti visa stamp issued on September 9, 1991 as a "visit" visa; in fact, properly translated, the stamp was a "residence" visa which, Ajaj argues, was impossible to obtain on that date as he was in the United States. Moreover, the government failed to translate the date of a Kuwaiti entry stamp, which, while partially obscured, is April 8th or 9th. Given that Ajaj's passport was issued in August 1991, that date would have to be April 8 or 9, 1992; Ajaj, however, was indisputably in Texas at that time. Ajaj argues that the government's own witness, INS inspector Mark Cozine, alerted the government to the defects in the passport when he testified at trial that the June 14, 1992, Pakistani entry stamp appeared to be counterfeit. Ajaj argues that the government, nevertheless, recklessly relied on the passport as evidence without confirming whether the passport stamps were authentic.
 
 
 234
 Furthermore, Ajaj argues that the government invited the jury to speculate as to his authorship of the handwritten notes in the notebooks. The government, which spared no expense during the trial, failed to obtain a handwriting expert and instead relied on the testimony of Carol Edelen, the government's fingerprint expert, to argue that Ajaj authored the notes in the handwritten manuals. Ajaj argues that the government deliberately failed to consult a handwriting expert and ignored the possibility that Ajaj did not author the handwritten notes.
 
 
 235
 Ajaj also argues that the government misrepresented to the jury that Ajaj lied to an Embassy official at the United States Embassy in Islamabad, Pakistan. The government at trial argued that on July 1, 1992, after completing his terrorist training, Ajaj traveled to the United States Embassy in Islamabad, Pakistan, to inquire whether he could return lawfully to the United States. The government accused Ajaj of lying to Karen Stanton, an Embassy official, that he possessed a five-year visa that he had left at home in the United States. Stanton informed Ajaj that the Embassy could not assist him. Ajaj argues that no testimony at trial established that he had lied about a five-year visa and that he did in fact leave a visa in the United States.
 
 
 236
 On review, we conclude that the government's arguments were based squarely on the evidence and were within the bounds of the broad latitude the government is given to suggest reasonable inferences to the jury. See Zackson, 12 F.3d at 1183. Ajaj's contentions warrant only brief discussion. The government did not misrepresent that Ajaj had facilitated Yousef's entry into the United States at Kennedy Airport. At trial, Customs Inspector Malafronte testified that Ajaj, when questioned at Kennedy Airport about whether he was traveling with another, claimed to be traveling alone. Ajaj's lie, in conjunction with Ajaj's possession of the terrorist materials, provided a firm basis for the government to argue that Ajaj facilitated Yousef's entry into Kennedy Airport. Furthermore, the government's argument that Ajaj authored the notes in the handwritten manuals was based on Carol Edelen's fingerprint placement testimony, which the district court properly admitted. Ajaj presents no evidence of government malfeasance in failing to obtain a handwriting expert, nor does Ajaj offer an explanation for his own failure to consult one.
 
 
 237
 The government also was entitled to rely on Ajaj's passport as a travel document. Ajaj, beyond his own conjecture, presents no evidence to indicate that the government deliberately concealed irregularities in the passport stamps. In fact, the government's translation displayed discrepancies in the stamps that Attorney Campriello highlighted in summation to argue that the passport was unreliable as a travel document. Moreover, even assuming that a proper government translation would have revealed the apparent inauthenticity of several stamps, these irregularities would not have undermined the reliability of the passport as a whole. The specific United Arab Emirates and Pakistani stamps on which the government relied to argue that Ajaj traveled in the Middle East did not bear apparent indicia of inauthenticity. Indeed, the authenticity of those stamps was corroborated by Ajaj's Pakistani Certificate of Registration, which was issued on June 14, 1992, and which corresponded to the June 13 United Arab Emirates exit stamp and the June 14 Pakistani entry stamp in the passport. The authenticity of these stamps also was corroborated by Ajaj's statement to Karen Stanton at the United States Embassy in Islamabad that as of July 1, 1992, Ajaj had been in Pakistan for only "a few weeks."[6] Although the government may have argued erroneously in summation that Ajaj lied to Karen Stanton at the United States Embassy about the location of a five-year visa, Ajaj did not object to this argument at trial. This point was of minor relevance to the government's case and hardly amounts to flagrant abuse.
 
 2. Attacks on the Defense
 
 238
 Ajaj argues that the government prejudicially attacked the defense during its summation. The government, at various points during its rebuttal summation, criticized Attorney Campriello for lacking "common decency," trying to be "cutesy," attempting to "foist" an opinion on the jury, and selling the jury "a bill of goods." The government also stated that Campriello's attempt to discredit the government's fingerprint expert, Carol Edelen, by likening her to Pinocchio, was "despicable," that Campriello's arguments were "preposterous" and that Campriello "made up" testimony and "ignored the evidence." Ajaj also argues that the government prejudicially accused Ajaj of "lying" to Karen Stanton at the United States Embassy and to INS inspectors at Kennedy Airport.
 
 
 239
 "[R]eversal on the basis of improper prosecutorial statements during summation is warranted only when the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial." Myerson, 18 F.3d at 163 (citations and internal quotation marks omitted). "We have repeatedly held that the Government is ordinarily permitted to respond to arguments impugning the integrity of its case and to reply with rebutting language suitable to the occasion." United States v. Bagaric, 706 F.2d 42, 60 (2d Cir.1983) (citations and internal quotation marks omitted). A reviewing court "must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo." United States v. Young, 470 U.S. 1, 12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). As Ajaj failed to object at trial to the government's purported attacks on the defense, we review the government's summation for flagrant abuse.
 
 
 240
 On review, we conclude that any improper conduct by the government was largely in response to Attorney Campriello's criticisms of the government's case and, in any event, did not rise to the level of flagrant abuse. Attorney Campriello had, at various points during his summation, referred to the government's arguments as "ridiculous," characterized the government's fingerprint expert, Carol Edelen, as "Pinocchio," and belittled the prosecutors by referring to them repeatedly by their first name only. Attorney Campriello also remarked that the weakness of the government's evidence required the prosecutors to "do a little slipping and sliding, a little bobbing, weaving, a little zigging and zaggin[g] as the case developed." In light of Attorney Campriello's criticisms, the government was entitled to respond with similar language in rebuttal.
 
 3. Change in Summation Theory
 
 241
 Ajaj argues that the government wrongfully shifted its theory of Ajaj's criminal liability during its summation. See United States v. Russo, 74 F.3d 1383, 1396 (2d Cir.) (improper for prosecutor to introduce a new theory of criminal liability at the last minute of a long trial), cert. denied, --- U.S. ----, 117 S.Ct. 293, 136 L.Ed.2d 213 (1996); United States v. Gleason, 616 F.2d 2, 25-26 (2d Cir.1979). According to Ajaj, at the commencement of trial, the government argued that Ajaj's role in the bombing conspiracy was to provide explosives expertise. In this regard, the government asserted that "Ahmad Ajaj ... brought the formula to make explosive materials that was the bomb into this country when he entered this country last September." The government further asserted that "Ajaj, in conjunction with Ramzi Yousef, was to supply essentially the recipe, the know-how, the expertise that was needed to carry out this terrorist conspiracy." According to Ajaj, the government shifted its theory in summation, however, and argued that Ajaj's role in the conspiracy was to sacrifice himself for Yousef's benefit at Kennedy Airport. The government stated: "What is Ajaj doing denying he knows Ramzi Yousef? Basically, he's sacrificing himself. If he got caught, he's going to get Ramzi Yousef--he's going to keep attention away from Ramzi Yousef, so that Ramzi Yousef can get into the country." The government later stated: "[Ajaj] c[a]me here with his partner Ramzi Yousef to do the same thing that Ramzi Yousef did. They traveled together. [Ajaj] sprung Ramzi Yousef into the country, and he did everything he could to help Ramzi Yousef after he got here. He did that because the evidence shows that he was part of the conspiracy." Ajaj argues that in conjunction with this unexpected shift in theory, the government, without any prior indication that it would do so, argued that Ajaj authored the notes in the handwritten notebooks and used Ajaj's passport as evidence of his travel to Saudi Arabia to obtain the letter of introduction. Ajaj contends that he was unprepared to meet these new arguments.
 
 
 242
 Ajaj's contentions are meritless. The government's theory of Ajaj's criminal liability was consistent throughout its opening statement and summation. At the outset of the trial, the government argued that Ajaj traveled to the Middle East to obtain explosives expertise and that Ajaj's "vital role in this conspiracy" was to reenter the United States with the terrorist materials. In summation, the government accordingly argued that Ajaj traveled overseas to obtain terrorist training and facilitated Yousef's entry into the United States by relieving Yousef of the terrorist materials. Contrary to Ajaj's argument, Attorney Campriello's summation reflects that he was well advised of the government's theory of Ajaj's criminal liability. During his summation, Attorney Campriello, among other rebuttal points, quoted extensively from INS inspector Mark Cozine's trial testimony in an effort to demonstrate that Ajaj in no way affected the INS's decision to release Yousef.
 
 
 243
 Furthermore, far from being unprepared to meet the government's "new" arguments that Ajaj's passport was evidence of his travel to Saudi Arabia and that Ajaj authored the notes in the handwritten notebooks, Attorney Campriello effectively rebutted the government's contentions with arguments that are now, ironically, echoed on appeal. With respect to the passport, Attorney Campriello argued that the presence of a number of demonstrably fraudulent stamps in the passport undermined the reliability of the passport as a whole. Furthermore, Attorney Campriello questioned the government's reliance on the testimony of a fingerprint expert to infer that Ajaj authored the handwritten notes. Attorney Campriello reminded the jury that the government had failed to obtain the testimony of a handwriting expert. In sum, the government did not unfairly raise new theories of Ajaj's guilt during summation.
 
 VI.
 JURY CHARGE
 A. The Bully Hypothetical
 
 244
 Salameh, Abouhalima and Ajaj each contend that the district court committed reversible error by employing in its jury charge a prejudicial example of a school bully to relate how circumstantial evidence could be used to infer culpable knowledge or intent, a material element of the crime of conspiracy. Specifically, after delivering an entirely appropriate hypothetical example of "Robinson Crusoe" to illustrate the meaning of circumstantial evidence, and after instructing that "circumstantial evidence ... is of no less value than direct evidence," the court charged the jury:
 
 
 245
 Knowledge and intent exists in the mind. No way, even with wonderful machines, with our Cat scans and all the rest of it that we can ever crawl into someone's head and figure out what's going on exactly, what is in his mind. You can't take a Cat scan of someone's brain and say, so, he was thinking this or that sometime. You can't conclude from that, and yet we draw a conclusion from actions of the person, what his knowledge was, what his intent was. You do it all the time. You do it from circumstantial evidence.
 
 
 246
 When you were a kid and you were in school, do you remember there was a bully. There was a bully in every kid's class, I am sure of it. Some kid, he'd come along and he'd step on the toe of the person beside him. The victim would yell. And the bully would look at the teacher and say, oh, it was a mistake. I didn't mean to do that. That was an accident. Every other kid in the neighborhood knew that it was no mistake. Right?
 
 
 247
 The direct evidence would be his declaration that it was a mistake and an accident. But by circumstantial evidence, ladies and gentlemen, you knew that it wasn't a mistake. It was him being a bully. You know, grown-ups are just big kids. We think the same way. You can conclude from circumstantial evidence what someone's intent or knowledge was. Direct evidence i[s] often misleading. Circumstantial evidence is quite sufficient. One thing you should recognize, it still must be proved beyond a reasonable doubt.
 
 
 248
 Salameh objected to the charge, stating that, "I just don't think [it is] a good example and I object to that." Abouhalima also objected to the charge on the ground that it purported to give circumstantial evidence more weight than direct evidence. No other objections were articulated. Ajaj merely asked the court to instruct the jury on reasonable inferences again, to ensure that the jury understood it was not required to draw any inferences from the evidence. Judge Duffy acquiesced, giving the following reminder:
 
 
 249
 I suggest to you that there are times when different inferences may be drawn from facts, whether they are proved by direct or circumstantial evidence. The government asks you to draw one set of inferences. The defendant asks you to draw another set.
 
 
 250
 [It is] for you and for you alone to decide what inferences, if any, you are willing to draw. If you decide to draw no inferences, that's fine. That's up to you. That's a determination that you are to make.
 
 
 251
 On appeal Salameh argues that in this case where the government's proof was entirely circumstantial, the charge improperly attributed more weight to circumstantial evidence than to direct evidence, relieving the government of its obligation to prove the mental element of the crime of conspiracy. In this regard, Salameh avers that the charge disparaged evidence "of his own words," purportedly direct evidence, that indicated that he did not knowingly participate in the conspiracy. This evidence included that Salameh: (1) gave his true name to DIB Leasing (the Ryder van rental agency) and volunteered his friends' names and telephone numbers, making it easy for law enforcement officers to trace him; (2) reported the Ryder van stolen to the police a full day before the bombing, creating the risk that the van would be stopped on its way to the World Trade Center, and presented Jersey City police officers with documents that showed the van's true identification number; (3) naively inquired of an ALG Welding Company employee whether stored hydrogen was dangerous; and (4) told David Robinson, the assistant manager of the Space Station, that "his boss and his employers" were expecting delivery of the hydrogen tanks. Furthermore, Salameh argues that Judge Duffy, by stating that he preferred the "quite sufficient" circumstantial evidence over "often misleading" direct evidence, unfairly suggested that the inferences requested by the government were warranted.
 
 
 252
 Echoing these concerns, Abouhalima and Ajaj join Salameh in also arguing that the charge, by assuming the guilt of a fictitious bully, suggested their guilt by likening them to bullies and liars and encouraged the jury to disregard inferences consistent with innocence. Moreover, they contend that because the hypothetical presumed that, like the bully, they had committed prior bad acts and had lied to conceal them, the charge "violated a basic foundation of our criminal justice jurisprudence--[that] evidence of prior bad acts is inadmissible to support an inference that the defendant committed the crimes with which he has been charged." See Fed.R.Evid. 404(b).
 
 
 253
 The government responds that the appellants failed to preserve for appeal their objection to the bully hypothetical to the extent it improperly assumed guilt. Furthermore, the government avers that even assuming that all objections were properly preserved, any error was purely harmless when considered in the context of the charge as a whole, which included the wholly appropriate "Robinson Crusoe" hypothetical[7] to explain circumstantial evidence.
 
 
 254
 A criminal defendant is required to state "distinctly" the grounds for his objection in order to preserve it for appeal. United States v. Biaggi, 909 F.2d 662, 697 (2d Cir.1990) (quoting Fed.R.Crim.P. 30). "The purpose of this provision is to provide the trial court with an opportunity to correct any error in the jury instructions before the jury begins deliberating." United States v. Masotto, 73 F.3d 1233, 1237 (2d Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 54, 136 L.Ed.2d 18 (1996). When an objection is properly preserved, we review that ground for error and may reverse only if the government is unable to demonstrate that the error was harmless, that is, that the error did not affect the defendant's substantial rights or influence the jury's verdict. See Olano, 507 U.S. at 734, 113 S.Ct. 1770 (under the harmless error standard, the government "bears the burden of persuasion with respect to prejudice."); United States v. Mussaleen, 35 F.3d 692, 695 (2d Cir.1994); see also Fed.R.Crim.P. 52(a).
 
 
 255
 "[W]here no timely objection [is] made to the instruction ... we may reverse ... only if the district court committed plain error in its charge." Latsis v. Chandris, Inc., 20 F.3d 45, 49 (2d Cir.1994) (internal quotation marks and citations omitted), aff'd, 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). Under the plain error standard, "[i]t is the defendant rather than the [g]overnment who bears the burden of persuasion with respect to prejudice." Olano, 507 U.S. at 734, 113 S.Ct. 1770. That showing must include "a miscarriage of justice, or ... an obvious instance of misapplied law." Latsis, 20 F.3d at 49 (internal quotation marks and citations omitted); see also Fed.R.Crim.P. 52(b); Olano, 507 U.S. at 732, 113 S.Ct. 1770 (we should not exercise that discretion "unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings" (citations, internal quotation marks and alteration omitted)).
 
 
 256
 Applying these principles to the instant case, the defendants' objection to the charge for improperly attributing more weight to circumstantial evidence than to direct evidence was "distinctly" stated at trial and hence preserved for appeal. However, because the defendants failed to articulate "distinctly" an objection to the bully hypothetical to the extent it improperly assumed guilt, we normally would review that ground for plain error. In this case, though, it appears that Judge Duffy denied the defendants the opportunity to provide the basis for their objection.[8] Accordingly, we review that ground under the harmless error standard.
 
 
 257
 "Whether jury instructions were properly given is a question of law that this court reviews de novo and, when assessing prejudice to the defendant, we appraise the significance of an error in instructions to the jury by comparing the instructions actually given with those that should have been given." United States v. Dove, 916 F.2d 41, 45 (2d Cir.1990). In considering whether there is prejudice, we "view[ ] as a whole the charge actually given." Id. (internal quotation marks and citation omitted).
 
 
 258
 Although Judge Duffy would have been better advised to use a neutral example in describing the difference between direct and circumstantial evidence to prove culpable knowledge, we conclude that, based on a review of the charge as a whole, the use of the bully hypothetical was not sufficiently prejudicial to require reversal. Generally speaking, "the use in a criminal case of [a] hypothetical that assumes guilt where a defendant asserts his innocence is disfavored. Certainly the use of such an example [is] more prejudicial than helpful and ... tend[s] to skew the jury away from the truth rather than toward it." Id. at 46. In Dove, we found reversible error where the district court employed a hypothetical example of "whether Jack shot Mary" to illustrate the difference between circumstantial evidence and direct evidence. Id. at 44. In that example, Jack's guilt was assumed in the hypothetical's premise and the jury was merely instructed on how to look for evidence of that guilt. Although the hypothetical was not analogous to the facts of that case, we nevertheless found prejudicial error because "[v]irtually all of the circumstantial evidence pointed towards the possibility of innocence" and, consequently, the hypothetical "may have led the jury to discount the circumstantial evidence ... of innocence." Id. at 46. Similarly, in both Gleason, 616 F.2d at 14-15, and United States v. Dizdar, 581 F.2d 1031, 1037 (2d Cir.1978), we reviewed circumstantial evidence instructions containing hypothetical examples which assumed guilt. Although in both cases the examples employed were analogous to the evidence before the jury, we found no reversible error. A review of the charges revealed that in each case the court had eliminated whatever prejudice might have been created by instructing the jury that the hypothetical "ha[d] nothing to do with [the] case" and "was not intended ... to suggest any particular direction to be given to the evidence." Dizdar, 581 F.2d at 1037 (internal quotation marks omitted); see Gleason, 616 F.2d at 14. Moreover, in Gleason, we specifically noted that the jury had been "adequately advised of the nature of circumstantial evidence [and] was repeatedly told to use 'common sense' ... in drawing inferences from facts." 616 F.2d at 14.
 
 
 259
 The problem with the instant charge is that, as in Dove, the bully's guilt is assumed in the hypothetical's premise and the jury is merely instructed on how to look for evidence of that guilt. Consequently, if "virtually all" of the circumstantial evidence pointed towards the possibility of innocence, we might well assume prejudice. However, most of the circumstantial evidence in this case points towards guilt. Furthermore, as in Dizdar, the district court cannot be said to have suggested to the jury that a particular direction should be given to the evidence, as the court, after the bully hypothetical, specifically reminded the jurors that they were free to draw any inferences in either direction. Moreover, as in Gleason, the jury was more than adequately advised of the nature of circumstantial evidence by the neutral "Robinson Crusoe" instruction and was told to use common sense in drawing inferences from the facts. In addition, any presumption of prejudice is strongly tempered by the lack of analogy between the bully hypothetical and the facts of this case. While it would not be a stretch for a jury to liken these defendants to bullies, "[w]e believe it would be denigrating the intelligence of the average jury to conclude that it would forsake its own common sense and experience for the suggestions implied in the court's ... example." Gleason, 616 F.2d at 15 (internal quotation marks omitted). Thus, we find that to the extent there was error, it was harmless.
 
 
 260
 We finally address the appellants' contention that the court improperly attributed more weight to circumstantial evidence than to direct evidence by stating that, "[d]irect evidence i[s] often misleading [while] circumstantial evidence is quite sufficient." While the court should have instructed the jury, as it did earlier in its charge, that both types of evidence are weighed equally, United States v. Botsch, 364 F.2d 542, 550 (2d Cir.1966), it is noteworthy that the court gave this instruction in the context of inferring culpable knowledge or intent.
 
 
 261
 Commentators agree that it is seldom possible to present testimonial or direct evidence of an accused's state of mind. Intent as a separate item of proof does not commonly exist. Thus, whenever intent is an element of a crime, its existence must be inferred by considering the laws that generally govern human conduct.... Circumstantial evidence of this subjective fact is therefore indispensable.
 
 
 262
 Mallette v. Scully, 752 F.2d 26, 32 (2d Cir.1984) (citations omitted). Because as a general rule most evidence of intent is circumstantial, it was perfectly reasonable for the court to emphasize the importance of that type of evidence. In any event, because the appellants' exculpatory evidence was also exclusively circumstantial (even Salameh's "evidence of his own words"), the court's instruction could not have resulted in prejudice. We further observe that, at Ajaj's request, the court explicitly repeated its earlier instruction on inferences, stating that jurors were free to draw inferences of innocence as well as guilt from the evidence, or no inferences at all. It therefore cannot be said that the court suggested to the jury that inferences favorable to the government were warranted. Consequently, we believe that to the extent the court erred, that error was harmless.
 
 B. Abouhalima--Terrorist Materials
 
 263
 Abouhalima next argues that the district court violated his due process rights by instructing the jury to disregard his argument that only one terrorist magazine article was found during the government's search of his apartment, an article entitled "Facing the enemies of God--[T]errorism is a[R]eligious [D]uty and [F]orce is [N]ecessary." Abouhalima maintains that the court's remarks denied him the ability to argue lack of incriminating evidence, gave the appearance of bias against him and infected his right to a fair trial.
 
 
 264
 Specifically, during summation, Abouhalima's counsel argued that although agents who searched his client's apartment took "a lot of materials, books, everything," the government only presented two of them. The government, disputing the accuracy of this argument, sought clarification, given that it had offered a total of seven items but the court had only allowed two of them into evidence--the terrorist magazine that Abouhalima refers to ("Facing the enemies of God") and a book that described the destruction of buildings, entitled "Rapid Destruction and Demolition." The court addressed that issue when it instructed the jury on the meaning of cumulative evidence, specifically stating:
 
 
 265
 Now, [Abouhalima's counsel] argued to you that the government only offered into evidence one magazine from his client Abouhalima's house, but what happened was the government wanted to put in a pile of stuff. The objection was properly taken. I thought it was cumulative. And I said it was cumulative. I tell you, you can draw no inference whatsoever from the absence of cumulative evidence.
 
 
 266
 During a break, Abouhalima's counsel objected to the instruction on grounds the court had actually excluded the evidence on the basis of lack of relevance, not because it was cumulative. Consequently, after that break the court gave the following curative instruction:
 
 
 267
 [Abouhalima's counsel] points out to me that he didn't object to any evidence on the basis of anything being cumulative. He objected on the basis of relevance.
 
 
 268
 Now, relevance means that something has a logical tendency to convince the mind that a fact is so or not so. That's what relevance is, and I ruled, apparently, not that it was cumulative, but that it was irrelevant because it has nothing to do with the issues in this case. I am quite sure he stated it right, so when I was talking to you about cumulative evidence I made a mistake.
 
 
 269
 Abouhalima did not object to this curative instruction or request additional corrective measures. On appeal, however, Abouhalima asserts that the correction was insufficient to cure the harm, and that the court should have apologized and instructed the jury to reevaluate Abouhalima's argument.
 
 
 270
 "This Court will reverse when 'it appears clear to the jury that the [district] court believes the accused is guilty.' " United States v. Bejasa, 904 F.2d 137, 141 (2d Cir.1990) (citing United States v. Nazzaro, 472 F.2d 302, 303 (2d Cir.1973)). "The vital question is not whether the trial judge's conduct left something to be desired but 'whether his behavior was so prejudicial that it denied ... appellant[ ] a fair, as distinguished from a perfect, trial.' " Id. (citation omitted). "[W]e must make an examination of the entire record ... in order to determine whether the defendant received a fair trial." Id. (internal quotation marks and citations omitted). Furthermore, when a court errs in the jury charge and delivers a timely curative instruction, we ordinarily may presume that the jury adhered to that correction unless "there is an overwhelming probability that the jury [was] unable to follow the court's instructions and the evidence is devastating to the defense." United States v. Colombo, 909 F.2d 711, 715 (2d Cir.1990) (internal quotation marks and citations omitted) (where prosecutor links a RICO defendant to the rape and sodomy of a woman as background information, but those charges are not before the jury, there is an "overwhelming probability" that, despite a court's curative limiting instruction, a jury would be unable to consider this evidence dispassionately). When a defendant fails to object to the curative instruction at trial, we review the court's instruction for plain error. See Olano, 507 U.S. at 734-36, 113 S.Ct. 1770. Under this standard, the appellant has the burden of demonstrating "a miscarriage of justice, or ... an obvious instance of misapplied law." Latsis, 20 F.3d at 49 (internal quotation marks and citations omitted).
 
 
 271
 We conclude that Judge Duffy's mistaken instruction did not convey to the jury that he believed Abouhalima was guilty. Such a message is, at the very least, muddled by the court's admission of error. We also conclude that based on the record as a whole, the court's error did not deprive Abouhalima of a fair trial. While the instruction may have momentarily undermined Abouhalima's narrow argument that there was a lack of incriminating evidence found in his apartment, the court's timely admission of error and corrective instruction minimized whatever prejudice could have been created by that mistake. See, e.g., United States v. Messina, 131 F.3d 36, 40 (2d Cir.1997), cert. denied, --- U.S. ----, 118 S.Ct. 1546, 140 L.Ed.2d 694 (1998). Because under these circumstances there is no "overwhelming probability" that the jury was unable to follow the curative instruction, Abouhalima cannot demonstrate prejudice, let alone a "miscarriage of justice" to warrant reversal under the plain error standard.
 
 C. Elements of the Charged Conspiracy
 
 272
 Abouhalima next assails the district court's denial of his request to charge concerning the intent required to be convicted of the conspiracy. Specifically, in Abouhalima's request to charge, he averred that, based on the conspiracy as charged in the indictment, the government was required to prove specific knowledge and intent to bomb the World Trade Center. The district court disagreed and instead instructed the jury that for purposes of unlawful intent, the object of the conspiracy "is not restricted to a particular building." Abouhalima argues that the district court's instruction was error because it invited the jury to convict him without finding the mental element of the crime charged. Moreover, Abouhalima asserts that the court's "sweeping language" concerning the object of the conspiracy resulted in his conviction "for participation in a conspiracy beyond that which was charged, noticed, and alleged in the government's proof." In this regard, Abouhalima argues that through the jury charge, the court constructively amended the indictment to reflect an offense not passed on by the grand jury. Furthermore, Abouhalima asserts that the indictment's repeated references to the World Trade Center and the government's repeated references to that complex during opening statements and summation required the government to prove a specific conspiracy to bomb the World Trade Center.[9]
 
 
 273
 We disagree. "In order to succeed when challenging jury instructions appellant has the burden of showing that the requested charge accurately represented the law in every respect and that, viewing as a whole the charge actually given, he was prejudiced." Dove, 916 F.2d at 45 (internal quotation marks and citations omitted). Because Abouhalima cannot show that his request to charge accurately represented the law, we do not reach the issue of prejudice.
 
 
 274
 It is well settled that the essential elements of the crime of conspiracy are: (1) that the defendant agreed with at least one other person to commit an offense; (2) the defendant knowingly participated in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and (3) that during the existence of the conspiracy, at least one of the overt acts set forth in the indictment was committed by one or more of the members of the conspiracy in furtherance of the objectives of the conspiracy. See Maldonado-Rivera, 922 F.2d at 961; see also United States v. Wallace, 85 F.3d 1063, 1068 (2d Cir.1996) (for purposes of conspiracy, unlawful intent is the "specific intent to achieve th[e] object [of the conspiracy]").
 
 
 275
 The indictment does not charge the defendants with conspiring to bomb the World Trade Center. The indictment alleges that the defendants conspired "to commit offenses against the United States." Four objectives of the conspiracy, each a separate bombing violation, are alleged as follows: (i) to bomb buildings used in or affecting interstate and foreign commerce, in violation of 18 U.S.C. § 844(i); (ii) to bomb property and vehicles owned by the United States, in violation of 18 U.S.C. § 844(f); (iii) to transport explosives interstate for the purpose of bombing buildings, vehicles, and other property, in violation of 18 U.S.C. § 844(d); and (iv) to bomb automobiles used in interstate commerce, in violation of 18 U.S.C. § 33. The World Trade Center bombing is not listed as an object of the conspiracy, but merely as one of 31 overt acts alleged to have been committed in furtherance of the conspiracy. Consequently, because the World Trade Center bombing is not alleged as an objective of the conspiracy, the district court did not err in refusing to charge the jury that specific knowledge and intent was required with respect to that bombing.
 
 
 276
 There is also nothing in the record to support Abouhalima's contention that the court's instruction eliminated the specific knowledge and intent required for conviction of the charged conspiracy and thereby constructively amended the indictment. A constructive amendment occurs when
 
 
 277
 the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.
 
 
 278
 United States v. Wallace, 59 F.3d 333, 337 (2d Cir.1995) (quoting United States v. Mollica, 849 F.2d 723, 729 (2d Cir.1988)); see also United States v. Delano, 55 F.3d 720, 729 (2d Cir.1995). Consistent with the indictment, the government argued to the jury that the defendants engaged in a conspiracy to bomb buildings, vehicles and property in the United States and the World Trade Center bombing was one act committed in furtherance of the overall conspiracy. Furthermore, the district court's jury charge closely tracked the indictment.[10] The jury also was given a copy of the indictment to take with it during its deliberations, which, as discussed above, clearly stated the objectives of the conspiracy. See United States v. Jones, 30 F.3d 276, 284 (2d Cir.1994) (perception of prejudice mitigated when jury is given a copy of the indictment). The evidence at trial established a conspiracy to bomb multiple targets and demonstrated that the conspirators successfully bombed the World Trade Center in furtherance of that conspiracy. Accordingly, there was no constructive amendment.
 
 
 279
 Finally, the government's multiple references to the World Trade Center in the indictment and during opening statements and summation did not require the court to charge conspiracy to bomb the World Trade Center. Aside from the unprecedented nature of Abouhalima's argument, those multiple references to the World Trade Center bombing were due to the fact that most of the substantive crimes charged in the indictment stemmed from that bombing.[11] In any event, the proof at trial demonstrated that the conspiracy encompassed considerably more than just the bombing of the World Trade Center, including: (1) the existence of additional chemicals recovered from the Shed after the bombing; (2) the modified timing device found in Ayyad's home; and (3) Ayyad's continuing attempts to procure additional explosive chemicals after the bombing. The most definitive proof of the broad scope of the conspiracy and the defendants' intent to commit additional bombings after the World Trade Center was the letter sent to the New York Times claiming responsibility for the bombing and the similar draft letter retrieved from an erased file on Ayyad's computer disk, both of which speak to future acts of terrorism.
 
 D. Ajaj's Objection to the Jury Charge
 
 280
 Ajaj attacks the district court's jury charge on three additional grounds: (1) the court failed expressly to charge the jury that to convict Ajaj of conspiracy, the jury was required to find that Ajaj agreed to the "essential nature of the plan"; (2) with respect to Ajaj's vicarious criminal liability on Counts Two to Six and Eight to Ten, the district court charged the jury under a Pinkerton theory of liability despite the lack of evidence that Ajaj was a conspirator; and (3) the district court failed to instruct the jury on the issue of Ajaj's withdrawal from the conspiracy.[12]
 
 1. Essential Nature of Plan
 
 281
 Ajaj argues that the district court failed to instruct the jury that to convict Ajaj as a member of the conspiracy, it had to find that he agreed to the "essential nature of the plan." According to Ajaj, the essential nature of the plan charged in the indictment was a scheme to bomb a "populated structure in an urban area." Ajaj argues that the court constructively amended the indictment by instructing the jury that Ajaj could be convicted of conspiracy if he shared in any of the conspiracy's four objectives and that this instruction rendered the conspiracy count duplicitous. See United States v. Aracri, 968 F.2d 1512, 1518 (2d Cir.1992) ("An indictment is duplicitous if it joins two or more distinct crimes in a single count."). Ajaj's arguments are meritless and we conclude that the district court committed no error.
 
 
 282
 To convict a defendant on a conspiracy charge, the government must prove that the defendant agreed to the " 'essential nature of the plan' ... and on the 'kind of criminal conduct ... in fact contemplated.' " Gleason, 616 F.2d at 16 (citations omitted). The defendant must be shown to have agreed "to commit a particular offense and not merely a vague agreement to do something wrong." United States v. Provenzano, 615 F.2d 37, 44 (2d Cir.1980) (emphasis added; citation and internal quotation marks omitted). A court's jury charge comports with this rule when it sets forth the "essential nature of the plan" by accurately describing "the essence of the [conspiracy's] underlying illegal objective[s]," United States v. Stavroulakis, 952 F.2d 686, 690 (2d Cir.1992), and then instructs the jury that the government must demonstrate " 'an agreement as to the objective[s] of the conspiracy,' " Bagaric, 706 F.2d at 63 (citation omitted); see United States v. Attanasio, 870 F.2d 809, 816-17 (2d Cir.1989). The government is not required to demonstrate that the defendant agreed to all of the conspiracy's objectives, as long as the defendant shared "some knowledge of the [conspiracy's] unlawful aims and objectives." United States v. Heinemann, 801 F.2d 86, 93 (2d Cir.1986) (internal quotation marks and citation omitted); Gleason, 616 F.2d at 16 ("[D]efendant need not know every objective of the conspiracy" to be convicted as a member.).
 
 
 283
 Here, the court instructed the jury in accordance with these requirements. The court instructed: "Before you can find that the defendant you are considering was a member of the conspiracy, you must conclude that you are satisfied beyond a reasonable doubt that he knowingly and willfully associated himself with the intent to aid in the accomplishment of the purpose of the conspiracy." The district court then instructed the jury on the "essential nature of the plan" by tracking the language of the relevant bombing statutes that comprised the conspiracy's objectives.
 
 
 284
 And we know the purposes are to damage and destroy and attempt to damage and destroy by means of fire and explosives, buildings, vehicles and other real and personal property used in interstate commerce. To damage and destroy by means of fire and explosives, buildings, vehicles and other personal property, in whole or in part owned, possessed, or leased to the United States or departments and agencies of the United States, to transport in interstate commerce explosives with knowledge and intent that the explosives were to be used unlawfully to damage and destroy buildings, vehicles, and other real and personal property, and to damage, disable, destroy, and place and caused to be placed explosives and other destructive substances in, upon, and in proximity to motor vehicles which were used, operated, and employed in interstate commerce.
 
 
 285
 The district court then instructed the jury that the government was not required to prove that the defendant agreed to all of the conspiracy's objectives. Rather, the court instructed that to convict Ajaj of conspiracy, "[w]hat is necessary is the defendant must have participated with knowledge of at least some of the basic aims and purposes of the conspiracy and with the intention of aiding in and accomplishing those unlawful ends." By accurately describing the essence of the underlying conspiratorial objectives as set forth in the indictment, the court guarded against the possibility that Ajaj would be convicted of merely entering into "a general agreement to engage in unspecified criminal conduct." United States v. Rosenblatt, 554 F.2d 36, 39 (2d Cir.1977); see United States v. Gallerani, 68 F.3d 611, 618 (2d Cir.1995) (instructions were erroneous when the jury could "convict the defendant of conspiracy without finding that he had any of the objectives alleged in the indictment"). The court also guarded against a constructive amendment of the indictment. See Wallace, 59 F.3d at 337. Contrary to Ajaj's argument, Count One of the Southern District indictment did not charge Ajaj with conspiring to bomb a populated structure in an urban area but with conspiring to secure four distinct criminal objectives.
 
 
 286
 We briefly dispose of Ajaj's remaining arguments. By charging the jury that Ajaj could be convicted as a member of the conspiracy if he shared some of the conspiracy's objectives, the court's charge did not thereby render the conspiracy count duplicitous. The court's instructions, as well as the indictment, charged Ajaj with membership in a single conspiracy with multiple criminal objectives. See Aracri, 968 F.2d at 1518 ("The allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime and that is one, however diverse its objects." (citation, internal quotation marks and alterations omitted)). Furthermore, the district court was not required to specifically instruct the jury, as an element of the conspiracy charge, that Ajaj could be convicted as a conspirator only if he agreed to the "essential nature of the plan." See generally Edward J. Devitt et al., Federal Jury Practice and Instructions § 28.03 (4th ed.1990) (setting forth essential elements of conspiracy instructions). The court's careful jury charge apprized the jury of the essence of the conspiracy's underlying illegal objectives and instructed the jury that Ajaj could be convicted of conspiracy only if he agreed to one or more of the objectives. We therefore affirm those jury instructions.
 
 2. Inclusion of the Pinkerton Charge
 
 287
 Ajaj and Abouhalima each contend that the district court erroneously instructed the jury that they could be convicted on Counts Two to Six and Eight to Ten under a Pinkerton theory of liability. The court instructed the jury that "[i]f in light of my instructions you find beyond a reasonable doubt that a defendant was a member of the conspiracy charged in Count One and, thus, guilty on the conspiracy count, then you may also, but you are not required, to find him guilty of any or all of the substantive crimes charged in Counts Two through Six and Counts Eight through Ten."
 
 
 288
 The district court then set forth the elements of the Pinkerton analysis:
 
 
 289
 First, the crime charged in the substantive count, that is, Counts Two through Six and Counts Eight through Ten was, in fact, committed.
 
 
 290
 Second, that the person or persons you find actually committed the crime were members of the conspiracy you found to have existed.
 
 
 291
 Third, that the substantive crime was committed pursuant to the common plan and understanding you found to exist among the conspirators.
 
 
 292
 Fourth, that the defendant was a member of the conspiracy at the time the substantive crime was committed.
 
 
 293
 And, fifth, that the defendant could have reasonably foreseen the substantive crime committed by his co-conspirators.
 
 
 294
 Neither Ajaj nor Abouhalima object to the substance of the district court's Pinkerton charge but each offers slightly different criticisms of that charge. Ajaj argues that the charge was improper in light of the absence of independent evidence supporting his membership in the conspiracy. Lacking such evidence, Ajaj argues that the district court's Pinkerton instruction improperly invited the jury to engage in an "inverse-Pinkerton " analysis whereby the jury inferred Ajaj's participation in the conspiracy from the commission of the substantive offenses. Abouhalima, offering a similar argument, contends that because there was insufficient evidence that he agreed specifically to bomb the World Trade Center, the court's Pinkerton instruction invited the jury to engage in an "inverse-Pinkerton " analysis. Abouhalima's argument rests on the premise that the object of the conspiracy charged in the indictment was a scheme to bomb the World Trade Center. We disagree and affirm the propriety of the court's charge.
 
 
 295
 Under the Pinkerton doctrine, "a jury [may] find a defendant guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy." United States v. Miley, 513 F.2d 1191, 1208 (2d Cir.1975) (citing Pinkerton v. United States, 328 U.S. 640, 645, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)). We have cautioned that "the Pinkerton charge should not be given as a matter of course and in particular where the evidence is such that the jury is required to resort to the inverse of Pinkerton and infer the existence of a conspiracy from the series of disparate criminal offenses." United States v. Corr, 543 F.2d 1042, 1050 (2d Cir.1976); see Gleason, 616 F.2d at 19; United States v. Sperling, 506 F.2d 1323, 1342 (2d Cir.1974) (improper to give Pinkerton charge when "the conspiracy ... must be inferred largely from the series of criminal offenses committed"); United States v. Cantone, 426 F.2d 902, 904-05 (2d Cir.1970).
 
 
 296
 Contrary to Ajaj's argument, the government presented ample evidence of Ajaj's membership in the conspiracy that bombed the World Trade Center. The government presented evidence that: (1) Ajaj traveled to the Middle East to obtain terrorist training; (2) Ajaj and Yousef studied the construction of explosive devices in the Middle East; (3) Ajaj and Yousef conspired to enter the United States illegally in furtherance of their plot to bomb buildings and vehicles in the United States; and (4) Ajaj remained in close contact with Yousef after his incarceration. See infra Part VII.B. (discussing Ajaj's sufficiency of evidence argument). Given the ample evidence supporting Ajaj's conspiracy conviction, the district court's Pinkerton charge did not invite the jury to engage in an "inverse-Pinkerton " analysis. See United States v. Harwood, 998 F.2d 91, 100 (2d Cir.1993). Indeed, the district court cautiously instructed the jury that Ajaj could be found guilty of the substantive crimes only after the jury had concluded that he was a conspirator.
 
 
 297
 Furthermore, Abouhalima's argument is predicated on the flawed premise that the object of the conspiracy was to bomb the World Trade Center. The indictment, however, alleged four separate objectives, none of which required the government to prove that the defendant was aware of the specific target of the bombing conspiracy. Accordingly, Abouhalima's "inverse-Pinkerton " argument is misplaced. Given the ample evidence of Abouhalima's knowing participation in the conspiracy's objectives, the court's Pinkerton charge was appropriate. See infra Part VII.C. (discussing Abouhalima's challenge to the sufficiency of evidence).
 
 
 298
 3. Failure to Charge on Withdrawal Sua Sponte
 
 
 299
 Ajaj argues that his arrest and incarceration on passport fraud charges approximately six months prior to the World Trade Center bombing entitled him to a jury instruction on withdrawal from the bombing conspiracy. Ajaj argues that the district court's failure to provide this instruction constituted plain error. We disagree.
 
 
 300
 A criminal defendant "is entitled to have instructions presented relating to any theory of defense for which there is any foundation in the evidence, no matter how weak or incredible that evidence may be." United States v. LaMorte, 950 F.2d 80, 84 (2d Cir.1991) (citation and internal quotation marks omitted); see United States v. Nava-Salazar, 30 F.3d 788, 799 (7th Cir.1994) ("A defendant is entitled to a withdrawal instruction only if the evidence could sustain that claim."). Typically, to sustain a withdrawal defense, a defendant is required to present evidence of some "affirmative action [taken] ... to disavow or defeat the purpose" of the conspiracy. Hyde v. United States, 225 U.S. 347, 369, 32 S.Ct. 793, 56 L.Ed. 1114 (1912). "Mere cessation of activity is not enough ...; there must also be affirmative action, either the making of a clean breast to the authorities ... or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." United States v. Borelli, 336 F.2d 376, 388 (1964).
 
 
 301
 A conspirator who presents evidence of his imprisonment during the course of the conspiracy is entitled to a jury instruction on withdrawal. See United States v. Panebianco, 543 F.2d 447, 453 (2d Cir.1976) ("[E]vidence that [defendant] had been incarcerated ... would have been enough to make his withdrawal a jury issue."); Borelli, 336 F.2d at 390 (concluding that although incarceration for a crime unrelated to the charged conspiracy does not entitle defendant to a directed verdict on withdrawal, "the fact [of incarceration] ... raise[s] a question for the jury on the issue of ... withdrawal"); United States v. Agueci, 310 F.2d 817, 839 (2d Cir.1962) ("The law is clear ... that while arrest or incarceration may constitute a withdrawal from a conspiracy, it does not follow that in every instance it must."); see also United States v. Consolidated Laundries Corp., 291 F.2d 563, 573 (2d Cir.1961). Whether a conspirator's imprisonment constitutes a withdrawal "must be decided by the jury in light of the length and location of the internment, the nature of the conspiracy, and any other available evidence." Panebianco, 543 F.2d at 454 n. 5.
 
 
 302
 Ajaj, who was incarcerated during the course of the conspiracy, therefore was entitled to a jury instruction on withdrawal. Ajaj, however, did not raise this contention at trial and we therefore assess the court's instructions for plain error under Fed.R.Crim.P. 52(b). We conclude that Ajaj has not met his burden of persuasion to demonstrate that the jury, properly instructed, would have found that Ajaj withdrew from the conspiracy.
 
 
 303
 Other than the fact of his incarceration, Ajaj presented no other evidence at trial to demonstrate that he withdrew from the conspiracy. The government, however, presented compelling evidence that Ajaj, through conversations with Abukhdeir and Yousef, retained a stake in the conspiracy during his six-month imprisonment. Ajaj discussed the bombing conspiracy in coded language and never affirmatively sought to distance himself from his coconspirators. In fact, during one such conversation, Ajaj agreed to convey the terrorist materials to Yousef. Therefore, in light of Ajaj's relatively short prison sentence on his passport fraud conviction, his internment in New York and the government's evidence demonstrating Ajaj's frequent contact with Yousef during the term of his incarceration, we conclude that the district court's failure to instruct the jury on withdrawal was not plain error.
 
 VII.
 SUFFICIENCY OF THE EVIDENCE
 A. Standard of Review
 
 304
 A defendant challenging a conspiracy conviction on sufficiency grounds "bears a heavy burden." Masotto, 73 F.3d at 1241 (citation omitted). We review the evidence in the light most favorable to the government and credit every inference that the jury might have drawn in the government's favor. See United States v. Aulicino, 44 F.3d 1102, 1114 (2d Cir.1995). Furthermore, we assess the evidence "not in isolation but in conjunction," United States v. Pitre, 960 F.2d 1112, 1120 (2d Cir.1992) (citation and internal quotation marks omitted), and the jury's verdict must be sustained if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "The government's case need not exclude 'every possible hypothesis of innocence' ... and it is the task of the jury, not the court, to choose among competing inferences." United States v. Martinez, 54 F.3d 1040, 1042-43 (2d Cir.1995). Deference to the jury's verdict is especially due when reviewing a conspiracy conviction because conspiracies are "secretive operation[s], and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." Pitre, 960 F.2d at 1121 (citations and internal quotation marks omitted).
 
 
 305
 To convict a defendant as a member of a conspiracy, the government must prove that the defendant "agree[d] on the essential nature of the plan." Gleason, 616 F.2d at 16 (citation and internal quotation marks omitted). To identify the "essential nature of the plan," we focus on the "essence of the underlying illegal objective[s]," and the "kind of criminal conduct ... in fact contemplated," Stavroulakis, 952 F.2d at 690 (citations omitted). See also Rosenblatt, 554 F.2d at 39. The government must prove that the defendant agreed "to commit a particular offense and not merely a vague agreement to do something wrong." Provenzano, 615 F.2d at 44 (emphasis added; citation and internal quotation marks omitted). Where conspirators are charged with pursuing multiple criminal objectives, the government is not required to prove that the defendant agreed to all of the objectives. Gleason, 616 F.2d at 16. Rather, the government must show that the defendant shared "some knowledge of the [conspiracy's] unlawful aims and objectives." United States v. Heinemann, 801 F.2d at 93 (citation and internal quotation marks omitted).
 
 
 306
 "[O]nce a conspiracy is shown, only slight evidence is needed to link another defendant with it." United States v. Roldan-Zapata, 916 F.2d 795, 802 (2d Cir.1990) (citation and internal quotation marks omitted). Mere association with conspirators and suspicious circumstances, however, are insufficient bases for a conspiracy conviction. See United States v. Nusraty, 867 F.2d 759, 763-64 (2d Cir.1989); United States v. Duckett, 550 F.2d 1027, 1030 (5th Cir.1977) ("The joint presence of the defendant and the conspirators at the airport and the preexisting relationship between the parties is insufficient alone to prove beyond a reasonable doubt that defendant had a part in the conspiracy.").
 
 
 307
 Moreover, we have held that "a conspirator can be held responsible for the substantive crimes committed by his co-conspirators to the extent those offenses were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if [the conspirator] did not himself participate in the substantive crimes." United States v. Romero, 897 F.2d 47, 51 (2d Cir.1990) (citing Pinkerton, 328 U.S. at 647, 66 S.Ct. 1180).
 
 B. Ajaj
 
 308
 Ajaj argues that the government presented insufficient evidence to establish his guilt on the counts for which he was convicted. As an initial matter, Ajaj argues that the government failed to prove his membership in the conspiracy that bombed the World Trade Center. Ajaj contends that the government's evidence fails to prove that Ajaj agreed to the "essential nature of the plan," that is, to bomb a populated structure in an urban area. According to Ajaj, the government's conviction was derived from evidence that proves nothing more than that Ajaj attempted to enter the United States illegally and had a passing association with Yousef. On appeal, Ajaj revisits the government's case at trial, seeking to demonstrate that the government's evidence is susceptible to alternative inferences consistent with Ajaj's innocence.[13]
 
 
 309
 Ajaj also argues that, assuming he is guilty of conspiracy, the government failed to present sufficient evidence under the Pinkerton doctrine that he is vicariously liable for crimes arising from the bombing of the World Trade Center. See Pinkerton, 328 U.S. at 647-48, 66 S.Ct. 1180. In the alternative, Ajaj argues that his incarceration before the construction and detonation of the World Trade Center bomb constituted a withdrawal from the conspiracy as a matter of law, shielding him from criminal liability for the offenses later committed by his co-conspirators. See United States v. Greenfield, 44 F.3d 1141, 1150 (2d Cir.1995). Ajaj also challenges the sufficiency of evidence supporting his conviction for violation of the Travel Act, 18 U.S.C. § 1952. To prove a violation of the Travel Act, the government was required to establish that Ajaj: (1) used a facility of interstate or foreign commerce; (2) with intent to commit any unlawful activity (including arson in violation of New York state law); and (3) thereafter performed an additional act to further the unlawful activity. See United States v. Jenkins, 943 F.2d 167, 172 (2d Cir.1991). The general definition of arson under New York law is the intentional or reckless damaging of a vehicle or building by fire or explosion. See N.Y. Penal Law §§ 150.05, 150.10 (McKinney 1988); United States v. Kahn, 472 F.2d 272, 277 (2d Cir.1973) ("[T]he initial inquiry in a Travel Act case is whether the underlying activity violates a state law."); see also United States v. Jones, 909 F.2d 533, 537 (D.C.Cir.1990). Ajaj's arguments are unpersuasive.
 
 
 310
 Count One of the Southern District indictment charged Ajaj with conspiring, in violation of 18 U.S.C. § 371, to (a) bomb buildings, vehicles and other property used in interstate commerce, 18 U.S.C. § 844(i); (b) bomb buildings, vehicles and other property owned, used by and leased to the United States and its departments and agencies, 18 U.S.C. § 844(f); (c) transport explosives interstate to bomb buildings, vehicles, and other property, 18 U.S.C. § 844(d); and (d) bomb automobiles used in interstate commerce with reckless disregard for the safety of human life, 18 U.S.C. § 33.
 
 
 311
 Counts Two to Six and Counts Eight to Ten charged Ajaj with the substantive offenses arising from the World Trade Center bombing. Ajaj was charged with (1) bombing a building used in or affecting interstate or foreign commerce, 18 U.S.C. §§ 844(i) and 2 (Count Two); (2) bombing buildings, vehicles and property owned, used by and leased to the United States and its departments or agencies, 18 U.S.C. §§ 844(f) and 2 (Count Three); (3) transporting a bomb interstate to destroy buildings, vehicles or other property, 18 U.S.C. §§ 844(d) and 2 (Count Four); (4) bombing vehicles used in interstate commerce, with reckless disregard for the safety of human life, 18 U.S.C. §§ 33, 34, and 2 (Counts Five and Six); (5) assaulting federal officers, 18 U.S.C. §§ 111 and 2 (Count 8); (6) using or carrying a destructive device during and in relation to a crime of violence, that is, the assault on federal officers charged in Count Eight and the bombing conspiracy charged in Count One, 18 U.S.C. §§ 924(c) and 2 (Counts 9 and 10, respectively). In addition, Count Seven charged Ajaj and Yousef with violating the Travel Act, 18 U.S.C. §§ 1952 and 2, by traveling in foreign commerce with intent to commit crimes of violence, namely arson, and to promote that unlawful activity.[14] For the following reasons, we conclude that the government presented ample evidence to support Ajaj's conviction on all ten counts.
 
 
 312
 With respect to the conviction under Count One for conspiracy, the government's argument at trial that Ajaj not only agreed to the essential nature of the plan but was one of the conspiracy's architects enjoyed solid evidentiary support. The government established that in April 1992, Ajaj surreptitiously traveled from the United States to Pakistan to attend Camp Khaldan, a terrorist training camp. Evidence presented at trial demonstrated that Ajaj traveled to Pakistan under an alias, misrepresented to his landlord in Texas that he was moving to New York, and sought to conceal his departure from family members. Ajaj, in the Middle East, obtained a letter of introduction to Camp Khaldan and terrorist materials that contained instructions on the sabotage of buildings and vehicles with explosives. Significantly, these manuals bore Ajaj's fingerprints as well as handwritten notes that set forth formulae for various explosives. Ajaj also obtained propaganda materials expressing anti-American sentiments, including an instructional videotape that began with the suicide bombing of an American Embassy using a van.
 
 
 313
 The government further established that Ajaj, once in the Middle East, made contact with Yousef and they together plotted to bomb targets in the United States. The presence of both of their fingerprints in the terrorist manuals indicated that Ajaj and Yousef studied the materials, assimilating knowledge that Yousef later applied directly to the construction of the World Trade Center bomb. For example, Ajaj's fingerprints appear on a manual page that contains the formula for urea nitrate, the same compound used as the main charge for the World Trade Center bomb.[15] The same section of that terrorist manual also instructs that the addition of aluminum powder and other metals enhance urea nitrate's destructive impact, instructions followed by the conspirators as well. Yousef's fingerprints appear on a manual page opposite the formula for ammonium nitrate, a compound the conspirators utilized to boost the bomb's main charge. Moreover, the conspirators used nitroglycerine and lead azide as "boosters" for the World Trade Center bomb, consistent with instructions contained in the handwritten notebooks.
 
 
 314
 The government demonstrated that after completing their training, Ajaj and Yousef jointly prepared to enter the United States illegally. Ajaj and Yousef carefully created false identities for themselves in the names of "Khurram Khan" and "Azan Mohammad," respectively. They collected false passports, identification cards and bank, education and medical records to support their false identities. According to the government, Ajaj agreed with Yousef that he would carry the terrorist materials in his own belongings to maximize Yousef's chances of entering the United States without garnering suspicion. To facilitate Ajaj's own entry into the United States with the terrorist materials, he was assigned a fake Swedish passport issued to a "Khurram Khan," as individuals bearing a valid Swedish passport do not need a visa to enter the United States. Later, on Yousef's arrest at Kennedy Airport, INS inspectors searched Yousef's belongings and found evidence linking him to Ajaj. Among other things, they found an identification card bearing Yousef's picture and the name "Khurram Khan" (Ajaj's alias) as well as a small notepad containing the Dallas, Texas, telephone number and address of Ajaj's friend, Mohammad Abukhdeir. Yousef, on questioning, claimed to be traveling alone, and he was later released on his own recognizance. Similarly, when INS officials searched Ajaj's belongings, they discovered evidence that linked Ajaj to Yousef. Among other things, they found a British passport and an airline ticket issued to an "Azan Mohammad," which was the alias that Yousef had traveled under. INS inspectors also found an identification card for a "Khurram Khan," identical to the one found in Yousef's possession, but with Ajaj's, not Yousef's, photograph affixed.
 
 
 315
 Evidence presented at trial also established that Ajaj facilitated Yousef's entry into the United States at Kennedy Airport and remained in close contact with Yousef after Ajaj's incarceration for passport fraud. Customs Inspector Robert Malafronte testified at trial that Ajaj, when questioned at Kennedy Airport as to whether he was traveling with others, lied and claimed to be traveling alone. According to the government, Ajaj, by relieving Yousef of the terrorist materials and lying about their association, effectively deflected the INS's attention away from Yousef and facilitated Yousef's entry into the United States.
 
 
 316
 Ajaj's participation in the conspiracy continued even after his incarceration on the passport fraud conviction. Ajaj stayed abreast of the conspiracy's progress through telephone conversations with Yousef. Ajaj never contacted Yousef directly but telephoned a friend, Mohammad Abukhdeir in Texas, who then, as an intermediary, either relayed messages or patched three-way calls to Yousef. According to the government, Ajaj, Abukhdeir and Yousef discussed the bombing conspiracy in code, referring to Yousef as "Rashed," the bomb plot as the "study" and the terrorist materials as "university papers." During one such conversation on December 29, 1992, Ajaj agreed to convey the terrorist materials to Yousef. Specifically, Ajaj informed Yousef that the United States District Court for the Eastern District of New York had ordered the government to return Ajaj's belongings, including the terrorist materials. When Yousef asked if he could take possession of Ajaj's belongings, Ajaj at first agreed but then opined that its shipment to Yousef would jeopardize Yousef's "business" which would be "a pity!" Ajaj suggested that it would be "preferable that you send someone else to get them." Yousef agreed, stating that he would "send someone else than me" and would give Ajaj, through Abukhdeir, the "address of someone here" who was one of Yousef's "friends." Ajaj agreed and assured Yousef that proceeding in this manner was "better so that you don't jeopardize your work."
 
 
 317
 In sum, the government presented ample evidence to demonstrate that Ajaj agreed to the essential nature of the conspiracy's plan. The government's evidence went far beyond proving Ajaj's mere association with terrorists and suspicious circumstances. The possibility that the government's evidence at trial is subject to alternative inferences consistent with Ajaj's innocence does not vitiate the reasonableness of the jury verdict.[16]
 
 
 318
 Furthermore, there was sufficient evidence to convict Ajaj of the substantive counts charged in the indictment. With respect to Ajaj's vicarious criminal liability on Counts Two to Six and Eight to Ten under the Pinkerton doctrine, the terrorist manuals and anti-American propaganda materials discovered in Ajaj's possession at Kennedy Airport constituted sufficient evidence for the jury to conclude that the crimes arising from the World Trade Center bombing were committed in furtherance of and were reasonably foreseeable consequences of the bombing conspiracy.[17] Moreover, in light of Ajaj's travel to the United States from Pakistan with the terrorist materials, and his denial of Yousef at Kennedy Airport, the evidence was sufficient to convict Ajaj under Count Seven for violating the Travel Act, 18 U.S.C. § 1952. As a final point, we reject Ajaj's argument that, as a matter of law, his incarceration on passport fraud charges constituted his withdrawal from the bombing conspiracy. To the contrary, we have held that "imprisonment for an offense unrelated to the conspiracy charged does not, standing alone, entitle a defendant to a directed verdict with respect to his withdrawal.... Thus, whether an imprisonment constitutes withdrawal from a conspiracy must be decided by the jury." Panebianco, 543 F.2d at 454 n. 5.[18]
 
 C. Abouhalima
 
 319
 Abouhalima argues that the evidence presented at trial does not support a finding that he was a participant in the conspiracy to bomb the World Trade Center, but instead shows only that he knew the other defendants in this case and was present when they were taking some of the actions that furthered the conspiracy. The indictment charged Abouhalima with the same substantive offenses arising from the World Trade Center bombing (Counts Two to Six and Eight to Ten) and participation in the same conspiracy (Count One) as Ajaj, see supra Part VII.B., and, like Ajaj, he was convicted on all of these counts. Abouhalima is correct that these convictions would be unsupported in the absence of an adequate showing that he was in fact a participant in the conspiracy. "[M]ere association with those implicated in an unlawful undertaking is not enough to prove knowing involvement" in that criminal activity. Nusraty, 867 F.2d at 764; see also, e.g., United States v. Rios, 856 F.2d 493, 496 (2d Cir.1988). Moreover, mere presence while actions are being taken in furtherance of a conspiracy is likewise insufficient to prove "knowing conspiratorial agreement." Nusraty, 867 F.2d at 764; see also United States v. Vilhotti, 452 F.2d 1186, 1189 (2d Cir.1971).
 
 
 320
 Contrary to Abouhalima's claims, however, the government presented more than enough evidence from which the jury could have concluded beyond a reasonable doubt that Abouhalima was a knowing member of the conspiracy and was guilty, either directly or on a Pinkerton theory, on all of the substantive counts with which he was charged.
 
 
 321
 First, there was testimony that Abouhalima helped Salameh and Yousef find the apartment at 40 Pamrapo. And the evidence that 40 Pamrapo was intended to and did serve as a bomb factory was strong. The location fit the recommendation in Ajaj's terrorist materials that a base of terrorist activities should be located in a ground floor apartment so as to facilitate easy escape if it should become necessary to flee the premises. The apartment had bluish stains on the walls and rust on the inside door knob and hinges of the back bedroom door, both consistent with the fumes generated by mixing explosives such as urea nitrate and nitroglycerine. Most important, samples of these two chemicals were found in scrapings taken from various items in the apartment.[19]
 
 
 322
 Second, a receipt entered into evidence showed that Abouhalima was the purchaser of a refrigerator that bore Yousef's fingerprint and contained traces of nitroglycerine. The government presented evidence that the 40 Pamrapo apartment had not been equipped with a refrigerator when Salameh and Yousef moved in, and also pointed to passages in Ajaj's terrorist manuals that recommended stabilizing nitroglycerine by freezing it. Although Abouhalima's refrigerator was recovered from another location, there was sufficient information to permit the jury to infer that Abouhalima supplied the refrigerator to Yousef and Salameh at the 40 Pamrapo apartment as a storage facility for nitroglycerine, and that the refrigerator was subsequently removed and taken to the location where it was later discovered.[20]
 
 
 323
 Third, there was testimony that, in the weeks preceding the bombing, Abouhalima, a limousine driver, made several unsuccessful attempts to secure the use of a van from his employer. The jury was entitled to conclude, in the light of the other evidence linking Abouhalima to the conspiracy, that Abouhalima sought to obtain such a vehicle in order to transport the bomb or otherwise to further the aims of the conspiracy, and that the co-conspirators were forced to rent the Ryder van because Abouhalima was unable to do so.
 
 
 324
 Fourth, one of Abouhalima's dress shoes, recovered from his apartment after the bombing, was found to have a burn that contained high levels of sulfate ions. The presence of such ions was shown to be consistent with having been burned by sulfuric acid, an ingredient in nitroglycerine. Moreover, a crystal of magnesium sulfate was found on the shoe. This substance can be made by mixing sulfuric acid and magnesium (an element that can enhance the destructive capacity of a urea nitrate bomb like the one used on the World Trade Center).
 
 
 325
 Fifth, in addition to the shoe, a copy of "Rapid Destruction and Demolition" was discovered at Abouhalima's home. Abouhalima's fingerprint was recovered from a page in this publication providing a formula for making explosives that could be used to destroy buildings. (Another copy of this same item was recovered from Ajaj at Kennedy Airport when Ajaj was stopped by United States customs officials as he attempted to enter the country with his terrorist materials.)
 
 
 326
 Sixth, there was evidence that Abouhalima purchased a can of "Hodgdon" brand smokeless powder, a substance similar to that used in the detonator of the bomb planted at the World Trade Center. After the bombing, a Hodgdon smokeless powder can was found in the storage shed along with the conspirators' other remaining chemicals. (The can had been emptied and then refilled with magnesium, another bomb ingredient.)
 
 
 327
 Seventh, the government offered telephone records for a calling card that belonged to Abouhalima. These revealed that Abouhalima was in frequent contact with the other defendants. Moreover, the card was used to make various calls to chemical companies and garden supply stores. These establishments sold ingredients that could be used to make the explosives employed in the World Trade Center bomb.[21]
 
 
 328
 Eighth, a gas station attendant identified Abouhalima as the driver of a Lincoln Town Car (to which Abouhalima had access in the course of his employment as a limousine driver) that accompanied the Ryder van carrying Salameh and Yousef (and presumably also the bomb) early in the morning of the day on which the bomb was detonated. The attendant stated that Abouhalima paid to fill the gas tanks of both vehicles.
 
 
 329
 Finally, on the day following the bombing, Abouhalima made arrangements to flee the country. On March 2, 1993, leaving his family behind, Abouhalima traveled from the United States to the Sudan without any luggage and with only a one-way ticket. The jury was entitled to infer consciousness of guilt from the facts surrounding this flight. See United States v. Sanchez, 790 F.2d 245, 252 (2d Cir.1986).
 
 
 330
 All of this evidence was more than sufficient, when taken together, to establish beyond a reasonable doubt that Abouhalima was a knowing and active participant in the conspiracy to bomb the World Trade Center; that he, himself, committed at least some of the substantive offenses in the indictment; and, to the extent that he did not directly participate in the substantive acts, that he was nonetheless liable under the Pinkerton doctrine.
 
 VIII.
 UNFAIR TRIAL--DUE PROCESS
 
 331
 Ajaj argues that the cumulative effect of the district court's errors, in addition to the prejudicial circumstances that hindered the presentation of his defense, resulted in a fundamentally unfair trial that violated his right to due process. See Taylor v. Kentucky, 436 U.S. 478, 487 & n. 15, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978) ("[C]umulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness."); United States v. Rivera, 900 F.2d 1462, 1477 (10th Cir.1990) ("Courts have ... found fundamental unfairness when error is considered in conjunction with other prejudicial circumstances within the trial, even though such other circumstances may not individually rise to the level of error."); United States v. Diharce-Estrada, 526 F.2d 637, 642 (5th Cir.1976). In addition to the district court's commission of a number of legal errors, Ajaj argues that his trial counsel did not have an adequate opportunity to prepare Ajaj's defense. Ajaj's trial counsel was appointed to represent Ajaj on June 21, 1993 and had less than three months to prepare before trial commenced on September 14, 1993. Ajaj argues that his attorney did not have enough time to conduct an international investigation in the Middle East or to translate and review critical Arabic documents and tapes. Compounding the difficulties, Ajaj's defense was hampered by Ajaj's poor English, his imprisonment, ill health, and the government's failure to provide critical items of discovery material in a timely manner.
 
 
 332
 We disagree. The record does not support Ajaj's claim that the circumstances of his trial were so prejudicial that his right to due process was denied. We conclude that Ajaj overstates the impact, if any, that his health and English-speaking ability had on the effective presentation of his defense. Moreover, Ajaj's contention that his attorney did not have an adequate opportunity to prepare his defense, given the speed with which his case was brought to trial and the government's discovery delays, is undermined by the failure of his attorney ever to seek a continuance. In sum, we conclude that Ajaj received a fair trial.
 
 IX.
 POST-TRIAL MOTIONS
 A. New Trial (Ajaj)
 
 333
 Ajaj moves for a new trial based on, inter alia, allegedly newly discovered evidence.[22]
 
 
 334
 This motion is before us in an unusual procedural posture. After the initial judgments of conviction (March 24, 1994) and sentences (May 24, 1994) were entered, the appellants filed their respective notices of appeal. Briefing was set, and appellants' briefs were due by June 30, 1995. On June 23, 1995, Abouhalima and Ajaj independently filed motions to remand the proceedings to the district court. One of the grounds for Ajaj's motion was the alleged discovery of new evidence. If the district court ruled favorably on some of the newly raised post-trial claims, it was reasoned, the appeals might be rendered moot. A panel of this court, consisting of (now) Chief Judge Winter, and Judges Calabresi and Cabranes, heard oral argument on the motion July 18, 1995, at which counsel for Ayyad and Salameh were also in attendance (the "Remand Motion").
 
 
 335
 At oral argument of the Remand Motion, counsel for Ajaj argued that the fact-dependent nature of Ajaj's new trial motion also militated in favor of resolution of the motion in the first instance by the district court, which was well-versed in the complexity of the case. In addition, counsel made clear that, since she was newly appointed, she required more time to complete the post-trial motion. Based on the consent of all four appellants, we granted the motions to remand, but denied Abouhalima's request for their reassignment to a different district judge. We therefore dismissed the appeals, but made clear that when the district court had decided the post-trial motions, the appeals would be automatically reinstated, without the need to file new notices of appeal. See United States v. Jacobson, 15 F.3d 19, 22 (2d Cir.1994). The order was filed the same day oral argument was heard.
 
 
 336
 Later that month, on July 26, the district court held a conference with respect to the post-trial motions. At this conference, Judge Duffy expressed skepticism with respect to the newly discovered evidence, reiterating that "I don't see anything new." Because Judge Duffy apparently believed that the meat of the post-trial motions lay in the ineffective assistance of counsel claims--the arguments that appeared ripe for presentation--he immediately scheduled an August argument date. But this was before Ajaj's counsel had had the opportunity to complete her full motion, which, as she had explained to the Remand Motion panel, would require some time.
 
 
 337
 Disenchanted with the district court's accelerated schedule, Ajaj returned to our court in August seeking a petition for mandamus to order the district court "(1) to review and decide the defendant's applications related to preliminary steps necessary to the finalizing of the defendant's motion for a new trial; (2) to then permit the filing of a completed motion for a new trial; and (3) to rule on the propriety of an evidentiary hearing and to issue a decision on the motion for a new trial in a manner susceptible of review by [our] Court."
 
 
 338
 On August 9, 1995, we denied Ajaj's mandamus petition (the "Denial of Mandamus Order"), but did so with leave to renew if the district court failed: (1) to receive the government's written responses to the post-trial motions; (2) to conduct such an evidentiary hearing as it may determine necessary no earlier than 30 days following the date the responses were received; and (3) to rule specifically on each issue raised by the post-trial motions.
 
 
 339
 Pursuant to this August order, and our original remand instructions, Ajaj's counsel filed her completed post-trial motion that October. The government filed a response on November 16, and the district court scheduled a conference the next day. At this November conference, Judge Duffy inquired whether counsel would be prepared to proceed to a hearing in fewer than thirty days (as specified by our Court's order), given the then-imminent sentencing in one of the related proceedings. Counsel declined, and were told that they would consequently have to wait "at least a year" to have their post-trial hearing.
 
 
 340
 While the parties waited for a post-trial hearing date, in April of 1996, Ajaj filed a Reply Brief to the government's answer to his post-trial motion. For reasons that are not altogether clear, Ajaj also filed a motion in this Court to reinstate the appeals that had been initially remanded at his request.
 
 
 341
 On April 29, 1996, another motions panel of our Court heard oral argument, and again summoned all parties' counsel (the "Reinstatement Motion"). Ajaj argued that because one of the original reasons for delaying the direct appeal (inadequate time to prepare) no longer existed, the case should proceed to the Court of Appeals. No mention was made of one of the other arguments originally pressed by Ajaj for remand--that the district court was the appropriate forum for initial resolution of the new trial motion. This Reinstatement Motion was heard by then-Chief Judge Newman, and Judges McLaughlin and Cabranes. In a published opinion, we granted the motion to reinstate the appeals. See United States v. Salameh, 84 F.3d 47, 51 (2d Cir.1996).
 
 
 342
 The Reinstatement Motion panel expressly addressed the issue of the still-unadjudicated post-trial motions, and the ability (and propriety) of passing on them at the appellate level in the first instance. It resolved the issue so as to maximize the flexibility of the panel that would ultimately hear the appeals--this panel:
 
 
 343
 We believe that concern [of the appellate panel's fitness to resolve the fact-dependent post-trial motions in the first instance] can be adequately dealt with by the merits panel to which these appeals will be assigned. In granting the motion to reinstate the appeals, we restore to our jurisdiction only the appeals for which notices of appeal were previously filed, i.e., the appeals from the four judgments of conviction. It will be up to the panel hearing those appeals to determine, upon proper application, whether appellate jurisdiction should be exercised to any additional extent and to what extent, if any, matters inserted into the record after the judgments of conviction should be considered.
 
 
 344
 Id.
 
 
 345
 As a result, the question before us is simply to what extent (if any) our panel should reach out and exercise jurisdiction over the yet-to-be-addressed post-trial motions. After carefully reviewing the claims of the appellants, and the procedural posture of this case, we decline to consider Ajaj's motion for a new trial at this time.
 
 
 346
 As the convoluted procedural history of this case demonstrates, Ajaj's motion for a new trial is grounded largely in newly discovered evidence. Indeed, as was originally argued to the Remand Motion panel, the complexity and fact-sensitivity of the claims require resolution of this motion, in the first instance, by the district court. For example, Ajaj cites such post-trial evidence as an interview with his Texas immigration lawyer and statements that arose at the Abdel Rahman trial. We think that the best solution for a motion that deals with post-trial matters of this sort is that it be addressed, as such motions normally are, by the district court first.[23]
 
 
 347
 The parties, on both sides, have spilt much ink over who is using and who is abusing the procedural machinery of the district court and of the Court of Appeals. And we also recognize that several comments made by Judge Duffy, taken out of context, might be read to suggest some hostility toward the newly discovered evidence claims. Some tension is perhaps unavoidable in a case of this difficulty and significance. We are confident, however--now that a large number of previous concerns over timing have been rendered moot--that the district court will be able to schedule proceedings expeditiously, and that the parties will assist that court by clarifying any issues that remain.[24] After that, as we indicated in our order denying mandamus, the district court may issue its order granting or denying some or all of the relief that is sought, and specifying the reasons for its conclusions. At that point, and only after the district court has ruled on the claims, should further application for appellate review be made by the parties.
 
 B. Ineffective Assistance of Counsel
 
 348
 Three of the four appellants, Abouhalima, Ajaj, and Ayyad, have made arguments regarding ineffective assistance of counsel. The procedural postures of these motions are varied: First, Abouhalima's ineffective assistance claims are not directly advanced on this appeal.[25] Second, Ajaj links some of his ineffectiveness claims to his new trial claims, which we have just concluded should best be decided by the district court. Finally, Ayyad presses his ineffectiveness claims on this direct appeal, preferring to have our court reach the merits forthwith.
 
 
 349
 Generally, Courts of Appeals are reluctant to address ineffectiveness claims on direct review. The rationale for this policy is that the constitutional sufficiency of counsel's performance is usually unripe for seasoned retrospection until after the trial and whatever appeal may follow. For this reason, many courts forbid a claim of ineffective assistance of counsel to be raised on direct appeal. See, e.g., United States v. McGill, 952 F.2d 16, 19 (1st Cir.1991); see also United States v. Cronic, 466 U.S. 648, 667 n. 42, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (noting the argument of the Solicitor General that ineffectiveness claims are more properly brought in 28 U.S.C. § 2255 petitions than on direct review). Similarly, there is generally no procedural bar that follows a failure to bring an ineffectiveness claim on direct review. See Billy-Eko v. United States, 8 F.3d 111, 114 (2d Cir.1993).
 
 
 350
 Our own Circuit does permit direct review of such claims in certain narrow circumstances. See id. at 114-15 (describing this as a "narrow category of cases" in which the defendant has a new counsel on appeal and argues no ground of ineffectiveness that is not fully developed in the trial record). And in such circumstances, the specter of procedural forfeit, if the claim is not raised, does exist. See id.
 
 
 351
 Because, however, Ajaj's ineffectiveness claims appear, at least in part, to intertwine with his newly discovered evidence allegations, and because Abouhalima's claims are not pressed on direct appeal, the only appellant to whom Billy-Eko arguably might apply is Ayyad. But Ayyad, while devoting much of his appellate brief to the ineffectiveness of his trial counsel, never explains why, given our disinclination to grant direct review of such allegations, we should hear his claims at this early juncture.
 
 
 352
 Moreover, the government's passing footnote reference to Billy-Eko hardly suffices to induce us to hear the claim at this time.[26] It must be remembered that the Billy-Eko doctrine is discretionary, and, given the baseline aversion to resolving ineffectiveness claims on direct review, see, e.g., United States v. Workman, 80 F.3d 688, 701 (2d Cir.1996), it should not be invoked lightly.[27]
 
 
 353
 Accordingly--and also taking into account the fact that Ayyad's co-defendants are having their ineffective-assistance claims remanded for adjudication by the district court--we decline to exercise our discretion to hear Ayyad's similar claims on direct review. We therefore add these to the arguments that are to be addressed first by Judge Duffy.
 
 X.
 SENTENCING
 
 354
 All the defendants seek vacatur of their sentences on the ground that the district court erred in allowing them to proceed pro se at their sentencing hearing. After renouncing their trial counsel, the four defendants participated in their May 24, 1994, sentencing proceeding without counsel. The government admits that the record does not reflect a knowing, intelligent and voluntary waiver of the defendants' right to counsel as mandated by Faretta v. California, 422 U.S. 806, 834, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and does not object to vacatur. We have reviewed the record and agree that the defendants do not appear to have waived their right to counsel at the sentencing hearing. Accordingly, we vacate and remand for resentencing.
 
 
 355
 Although Abouhalima has at times indicated that we should consider reassigning the remanded proceedings to a different judge, such a measure is rarely taken. See United States v. Gaviria, 49 F.3d 89, 92 (2d Cir.1995) ("[R]emanding to a different district judge is an extraordinary remedy ... [to] be reserved for the extraordinary case.") (internal quotation marks and citation omitted; alteration in original). More important, at oral argument all four appellants were expressly asked if they had any objection to matters being returned to Judge Duffy, and no such objections were raised. Under the circumstances, we believe the sentences in all four cases should be vacated and the matter remanded to Judge Duffy.[28]
 
 CONCLUSION
 
 356
 We have conducted a thorough review of all the arguments raised by appellants, and find no basis for reversal in any of them. Accordingly, and for the reasons presented above, we AFFIRM the judgments of conviction as to all four defendants, we DISMISS and REMAND their post-trial motions as premature for appellate consideration (acknowledging our previous Order Denying Mandamus), and we VACATE appellants' sentences and REMAND for resentencing.
 
 
 
 [1]
 Because defendants appeal their convictions after a jury trial, our statement of the facts views the evidence in the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor. See United States v. Aulicino, 44 F.3d 1102, 1114 (2d Cir.1995)
 
 
 [2]
 Yousef was captured in Pakistan on or about February 8, 1995. He was tried and convicted in 1997. See United States v. Salameh, S12 93 Cr. 18(KTD). Yasin remains a fugitive
 
 
 [3]
 In his opening instructions to the jury, Judge Duffy explained: "There are four defendants on trial here. There are four trials occurring before you. Each one of the defendants must be considered totally separate and apart from the others. Each [is] to be treated individually." At the conclusion of the trial, Judge Duffy instructed the jury as follows: "You must make separate determinations as to whether or not any defendant has been proved guilty beyond a reasonable doubt. In making that judgment, you are to disregard entirely the circumstance that the defendant is tried with the three others, that counsel for the various defendants worked together during the trial, that they have divided part of the cross-examination up."
 
 
 [4]
 The differences in the spelling of "Rashid" and "Rashed" are a result of different transliterations of the name from the Arabic. There was no evidence that more than one "Rashid" or "Rashed" was involved in the events giving rise to this case
 
 
 [5]
 Ajaj, on appeal, sets forth a host of purported misrepresentations by the government. On review, the majority of his claims are groundless and we limit our discussion to his remaining contentions. Ajaj also bolsters his prosecutorial misconduct claims with new evidence. As we have concluded that we will not consider Ajaj's new evidence on this appeal, we do not consider it here. See infra Part IX.A
 
 
 [6]
 Ajaj argues that the government's own witness, INS inspector Mark Cozine, alerted the government to the possibility that the June 14, 1992, Pakistani entry stamp was fraudulent. Ajaj engages in a selective quotation of this testimony. While Inspector Cozine did testify that the Pakistani entry stamp appeared to be fraudulent, he later qualified that remark by stating that the stamp could have "been altered from whatever chemical was used to bring out the fingerprints."
 
 
 [7]
 In the "Robinson Crusoe" example, the court stated: "[Do you r]emember at the beginning of trial I gave you an example of circumstantial evidence? I told you about Robinson Crusoe and the fact that I had to do a book report in the second year of high school on that. I told you that he was ship wrecked and ended up on a desert island that was totally uninhabited. He knew it was uninhabited because he had been all over the desert island and he could find nobody else there. One day, he goes down to the shore, and there in between the line where the tide had been and where the water was when he arrived was a big set of size 13D footprints. Robinson Crusoe had 9s. He walked over. He said, they are not mine. That's circumstantial evidence. Of what? Of the fact that somebody else is on the island. If the issue [was] is the island totally uninhabited except for Robinson Crusoe, do you think he would have any difficulty in figuring out that somebody else was there? Do you think he did? No, of course not, from circumstantial evidence, he drew the inference that somebody else was on the island. Circumstantial evidence, ladies and gentlemen, if believed is of no less value than direct evidence. In either case, in a criminal case like this, you still must be convinced beyond a reasonable doubt."
 
 
 [8]
 The record reflects the following colloquy:
 Mr. Bashir: (assistant counsel for Abouhalima). Now it is my understanding that the court is going to be allowing objections but was not asking for the basis of the objection to be placed on the record.
 The Court: Yes.
 Mr. Bashir: It is my reading of the particular rules of the court, especially [R]ule 103 seem[s] to indicate that that would be eliminating any potential for appeal if we do not have the basis of the objection on the record.
 The Court: That doesn't work that way. If I restrict you from giving the basis for the objection, if there is an appeal, you have from the time you made the objection to the time you get to appeal to figure out your best basis for objecting, okay?
 
 
 [9]
 To the extent that Abouhalima argues that the court failed to charge on the "essential nature of the agreement," we reject that argument as meritless. See infra Part VI.D.1 (discussion in connection with appellant Ajaj)
 
 
 [10]
 In the relevant portion of the jury charge, the court stated: "I suggested in a shorthand way apparently that the objects of the conspiracy was to blow up the World Trade Center, but that's not accurate. The objects of the conspiracy are the four objects listed in the indictment. That is, the first one being to damage and destroy by means of fire and explosives buildings, vehicles and other real and personal property used in interstate commerce. Paragraph 3 [of the indictment] is to damage and destroy by means of fire and explosives buildings, vehicles and other personal property in whole or in part owned, possessed, used by or leased by the United States and departments and agencies thereof. The fourth paragraph [of the indictment], the object is transportation in interstate commerce of the explosives with knowledge and intent that the explosives were to be used unlawfully to damage and destroy buildings, vehicles and other real and personal property. The fifth one is with a reckless disregard for human life to damage, disable, destroy and place and cause to be placed explosives and other destructive substances in and upon in proximity to motor vehicles which are used, operated and employed in interstate commerce. In my shorthand way I misstated it. Those are the objects as charged in the indictment. It is not restricted to a particular building."
 
 
 [11]
 For substantially the same reasons, we reject Abouhalima's further contention that the government shifted its theory of its case through repeated references to the World Trade Center bombing in its opening statement and summation, thereby depriving him of a fair trial
 
 
 [12]
 Like Ajaj, Abouhalima objects to the district court's Pinkerton instruction. We therefore address Abouhalima's contentions as well
 
 
 [13]
 Ajaj also seeks to demonstrate the insufficiency of the government's case by including in his arguments new evidence obtained since his conviction. As we have concluded that we will not consider Ajaj's new evidence on this appeal, we do not consider it here. See infra Part IX.A
 
 
 [14]
 Section 1952 provides, in pertinent part, that
 (a) Whoever travels in interstate or foreign commerce ... with intent to--
 ...
 (2) commit any crime of violence to further any unlawful activity; or
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform--
 (A) an act described in paragraph (1) or (3) shall be fined under this title, imprisoned not more than 5 years, or both; or
 (B) an act described in paragraph (2) shall be fined under this title, imprisoned for not more that 20 years, or both, and if death results shall be imprisoned for any term of years or for life.
 (b) As used in this section (i) "unlawful activity" means ... (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States.
 18 U.S.C. § 1952.
 
 
 [15]
 Homemade bombs generally consist of at least three parts: a "main charge" (the primary explosive), a "booster" and a "detonator." A "booster" is a smaller explosive that initiates the explosion of the main charge. The detonator triggers the booster
 
 
 [16]
 Contrary to Ajaj's argument, the government was not required to prove that Ajaj agreed to bomb a "populated structure in an urban area." None of the four criminal objectives charged in the indictment required the government to prove that the defendant was aware of the specific target of the bombing. See 18 U.S.C. §§ 33, 844(d), 844(f), and 844(i) (collectively referring to crimes against "any" building, vehicle, or property); e.g., United States v. Carlson, 561 F.2d 105, 108 (1st Cir.1977) (rejecting defendant's argument under 18 U.S.C. § 844(d) that "the Government needed to establish his specific intent to bomb the exact three targets named in the indictment"); see also United States v. Eisenberg, 596 F.2d 522, 526 (2d Cir.1979) (the government is not required to prove any greater knowledge of the substantive offenses that comprise the conspiracy's objectives than that required to prove the commission of the substantive offenses themselves)
 Nor was the government required to prove that Ajaj knew that (a) the bombing target was used in interstate commerce, (b) the property was owned, used by or leased to the United States and its departments or agencies, or (c) that the explosives were transported across state lines. These aspects of the conspiracy's criminal objectives are jurisdictional, not substantive, elements. See, e.g., United States v. Barton, 647 F.2d 224, 233 (2d Cir.1981) (interstate commerce element of § 844(i) is "jurisdictional, rather than substantive"); United States v. Davis, 98 F.3d 141, 144 (4th Cir.1996) (under § 844(f), requirement of use by United States is jurisdictional), cert. denied, --- U.S. ----, 117 S.Ct. 1274, 137 L.Ed.2d 351 (1997); United States v. Berberian, 851 F.2d 236, 238-39 (9th Cir.1988) (government not required to prove that defendant, under 18 U.S.C. § 844(d), knew that explosives crossed state lines).
 
 
 [17]
 The government also argued in the alternative that Ajaj was criminally liable on Counts Two to Six and Eight to Ten on an aiding and abetting theory. As we conclude that there was sufficient evidence to convict Ajaj on those counts under the Pinkerton doctrine, we do not reach this argument
 
 
 [18]
 Ajaj, for the first time on appeal, argues that on January 4, 1993, Attorney Morris, acting pursuant to Ajaj's direction, requested that the government deliver Ajaj's belongings to his immigration attorney in Houston, Texas. Ajaj argues that this action constituted an affirmative act of withdrawal as it defied Yousef's earlier December 29, 1992 request for the terrorist materials. This argument is made for the first time on appeal and there is no evidence in the trial record to support this contention. We therefore do not consider it here with respect to Ajaj's sufficiency challenge
 
 
 [19]
 Evidence was also presented from which the jury could have drawn an inference that, once Salameh and Yousef had moved into the apartment, Abouhalima was a frequent visitor there. To take only a single example, a witness, Carl Butler, testified that on one occasion a man fitting Abouhalima's description sat outside the apartment building in a Lincoln Town Car (a type of vehicle to which Abouhalima, a limousine driver, had access) and yelled something--in a foreign language that Butler did not understand--to a tenant of the apartment who fit Salameh's description. Apparently in response to shouted instructions from the man in the car, the tenant of the apartment, who had been carrying five gallon buckets out of the building, ran back inside, reemerged with another such bucket, and drove away, with the man in the car following him
 
 
 [20]
 In any event, there was strong evidence that the refrigerator was employed by the conspirators as part of their bomb-making project, whether at 40 Pamrapo or elsewhere
 
 
 [21]
 On the day of the bombing, Abouhalima contacted the telephone company to report that all of the calls that had been made on the calling card were unauthorized. He claimed at trial that he had also called the telephone company to cancel the card some two and one-half weeks earlier. A telephone company representative stated, however, that no such request appeared in the phone company's records. Under these circumstances, the jury was entitled to reject Abouhalima's explanation of the charges to the calling card, and to infer that the calls made on it were either made by Abouhalima or, if made by the other conspirators, were authorized by Abouhalima
 
 
 [22]
 He also claims ineffective assistance of counsel, which we address below. See infra Part IX.B
 
 
 [23]
 Similarly, to the extent that Abouhalima also raises claims of newly discovered evidence--the record suggests that his counsel filed a letter dated November 24, 1995, that referenced "Other New Evidence Under Investigation"--these too should be resolved in an orderly manner before the district court on remand
 
 
 [24]
 We note that the law of the case will now foreclose some of the arguments advanced for post-trial relief
 
 
 [25]
 At oral argument, however, counsel indicated that he would be willing to have our panel consider his claims if we elected to address similar ones of his co-defendants
 
 
 [26]
 Ayyad is in no way to be criticized for raising his ineffective assistance claims, however. As we made clear in Billy-Eko, counsel are encouraged to err on the side of including an ineffectiveness claim on direct review (even if it is unripe) to preclude the possibility of procedural forfeiture. See Billy-Eko, 8 F.3d at 116
 
 
 [27]
 The government's "consent" to hear this claim on direct appeal is of no significance. While the Billy-Eko rule is not jurisdictional, it is nonetheless inappropriate to permit the parties to "confer" jurisdiction on the Court of Appeals. The preference for hearing ineffectiveness claims on collateral review is, in part, a prudential measure that has underpinnings in judicial efficiency and deliberative integrity. As such, it cannot be dictated solely by the agreement of the parties
 
 
 [28]
 We leave it up to the district court whether it prefers to defer resentencing until after it has adjudicated the post-trial motions, and, if it does so elect, whether it deems it appropriate to certify any grants or denials of post-conviction relief to us in order to expedite potential appellate review. These administrative matters are for the parties' scheduling conference. We hope, however, that such matters may be clarified in advance to avoid some of the procedural confusions that have plagued these appeals